**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AIR TRANSPORT ASSOCIATION OF AMERICA, INC., and DELTA AIR LINES, INC., <br><br> Plaintiffs, <br><br> AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, <br><br> Plaintiff-Intervenor <br><br> v. <br><br> EXPORT-IMPORT BANK OF THE UNITED STATES, FRED P. HOCHBERG, in his Official Capacity as Chairman and President of the Export-Import Bank of the United States, WANDA FELTON, in her Official Capacity as First Vice President and Vice Chair of the Export-Import Bank of the United States; and SEAN MULVANEY, in his Official Capacity as Member of the Board of Directors of the Export-Import Bank of the United States, <br><br> Defendants. | Civil Action No. 1:11-cv-02024-JEB <br><br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Air Transport Association of America, Inc. ("ATA"), on behalf of certain of its

members, and Delta Air Lines, Inc. ("Delta"), by and through its undersigned attorneys, allege as

follows:

**BACKGROUND**

1.       The Export-Import Bank of the United States (the "Ex-Im Bank" or the "Bank") is a federal agency and a wholly-owned U.S. government corporation that provides loans, loan guarantees, and insurance commitments to foreign corporations.

2.       The Ex-Im Bank makes substantial commitments to foreign corporations.  Since Financial Year ("FY") 2008, the Ex-Im Bank has committed nearly $60 billion in U.S. Treasury funds.  In FY2010, the outstanding principal amount of all loans made, guaranteed, or insured by the Ex-Im Bank stood at about $75 billion, and between FY2006 and FY2010, the Bank's total exposure averaged approximately $64 billion.  Roughly 80% of those commitments finance foreign corporations.

3.       All of the Ex-Im Bank's obligations carry the full faith and credit of the U.S. government.  That means that if the recipient of a loan, loan guarantee, or insurance commitment from the Bank fails to pay its debt, the U.S. Treasury, and hence the American taxpayers, pick up the bill.

4.       The Ex-Im Bank has a clear statutory obligation to consider the effects of its loan guarantees on both domestic industry and on domestic employment.  These laws reflect Congress's intent to prevent U.S. taxpayers from funding purchases by foreign companies that cause U.S. companies to be harmed or U.S. workers to lose jobs.

5.       The Ex-Im Bank's loan portfolio is overwhelmingly devoted to financing the purchase of airplanes for export.  In FY2010, the Bank's total exposure of outstanding loans was $75.2 billion, and approximately 47% of this amount was for air transportation loans — more than the three next-largest industrial sectors combined.

6.     The Ex-Im Bank's aggressive approach to aircraft financing allows foreign airlines to borrow at much cheaper rates than domestic airlines.  Cheaper financing, in turn, leads to competitive advantages for foreign airlines vis-à-vis their American competitors, shifts industry growth abroad, and puts downward pressure on American production and employment.

7.     Despite its statutory obligations, the Ex-Im Bank routinely fails to evaluate the negative impact that its commitments have on domestic industries and domestic employment.

8.     The Bank's aircraft-financing policies in general and its support for Air India violate the Export-Import Bank Act of 1945, as amended, 12 U.S.C. § 635 *et seq.* (the "Bank Act"), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 US.C. §§ 2201, 2202 (declaratory and further relief); 5 U.S.C. § 702 (APA); 28 U.S.C. § 1651 (All Writs Act); and 28 U.S.C. § 1361 (mandamus).

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because this is an action against an agency of the United States, and at least one plaintiff and at least one defendant reside in this district.

## PARTIES

11.     Plaintiff ATA is the principal trade association representing scheduled airlines in the United States.  ATA is headquartered in Washington, D.C.  ATA's purposes include working with its members in legal, political, and regulatory arenas to foster a business and regulatory

environment that promotes a safe, secure, and financially successful U.S. airline industry.  This complaint is brought on behalf of certain members of ATA.[*]

12.     Plaintiff Delta is a domestic air carrier engaged primarily in the transportation of passengers in interstate and international commerce.  Delta competes with Air India for passengers traveling to and from international destinations.  Through its own planes or in combination with planes from its joint-venture partners, Delta serves at least fifteen different international destinations that Air India also serves from the same U.S. city.  Delta also serves many other international destinations (including Beijing, Melbourne, and Kuala Lumpur) that the Ex-Im Bank's commitments will allow Air India to begin serving from the same U.S. city.

13.     ATA's operator members, including Delta, purchase aircraft from, among others, The Boeing Company ("Boeing").  When ATA's operator members, including Delta, purchase such aircraft, they must do so without the United States as a guarantor for their financing.  As a result, ATA's operator members, including Delta, pay substantially more than the Bank-backed foreign carriers pay to finance the same Boeing aircraft.

14.     The Bank's support for foreign carriers puts ATA's operator members, including Delta, at a competitive disadvantage because, among other things, the Bank's foreign beneficiaries have access to cheaper capital to finance their aircraft purchases.  In order to compete with the foreign airlines that the Ex-Im Bank subsidizes, ATA's operator members, including Delta, must reduce or altogether eliminate capacity on certain routes, harming U.S. airlines and their customers in the process.  Lost capacity also harms ATA's operator members'

---

[*] United Air Lines, Inc., Continental Airlines, Inc., American Airlines, Inc.; Atlas Air, Inc., Federal Express Corp., and United Parcel Service Co. do not join this suit.  ATA's other U.S. members include AirTran Airways; Alaska Airlines, Inc.; ASTAR Air Cargo, Inc.; Delta Air Lines, Inc.; Evergreen International Airlines, Inc.; Hawaiian Airlines; JetBlue Airways Corp.; Southwest Airlines Co.; and US Airways, Inc.

employees, including Delta's employees, because it forces U.S. airlines to cut jobs and reduce payrolls.

15.     ATA's U.S. members, including Delta, incur harms of the type described above every time a foreign airline places a new aircraft into service to or from the United States using Bank-backed financing.

16.     Defendant Ex-Im Bank is the official export credit agency of the United States. The Bank is headquartered in Washington, D.C.  The Bank offers working capital guarantees, export credit insurance, direct loans, and loan guarantees to benefit U.S. exporters.

17.     Fred P. Hochberg is the Ex-Im Bank's President and Chairman.  Defendant Hochberg has overall responsibility for assuring the Ex-Im Bank's compliance with the law.

18.     Wanda Felton is the Ex-Im Bank's First Vice President and Vice Chair.  On information and belief, Defendant Felton is responsible for voting to approve the Ex-Im Bank's commitments.

19.     Sean Mulvaney is a member of the Board of Directors of the Ex-Im Bank.  On information and belief, Defendant Mulvaney is responsible for voting to approve the Ex-Im Bank's commitments.

20.     An order of this Court declaring the Ex-Im Bank's commitments to foreign carriers unlawful will redress the injuries to ATA's operator members, including Delta, and their employees because it will ensure that the Ex-Im Bank does not finance transactions that unduly harm domestic industry including, in particular, U.S. airlines.

## **STATUTORY FRAMEWORK**

21.     President Franklin D. Roosevelt established the original Export-Import Bank of Washington during the Great Depression in order to "reduce and relieve unemployment, to

improve standards of labor, and otherwise rehabilitate industry" by increasing U.S. exports. Exec. Order No. 6581, 12 C.F.R. § 401 (Feb. 2, 1934), *reprinted as amended in* 12 U.S.C. § 635. Congress turned the corporation into an "agency of the United States" and codified its powers in the Bank Act, under which the Bank's "objective" in making loans, loan guarantees, and other commitments continues to be "maintaining or increasing employment of United States workers." 12 U.S.C. § 635(a)(1).  The Bank Act further expresses "the policy of the United States that the Bank in the exercise of its functions should supplement and encourage, and not compete with, private capital," and "that loans, so far as possible consistent with . . . carrying out the [Bank's] purposes . . . offer reasonable assurance of repayment."  *Id.* § 635(b)(1)(B).

22.     The Bank Act authorizes the Ex-Im Bank to extend various types of commitments to foreign buyers, including direct loans and loan guarantees, but expressly requires that such commitments comply with several procedural requirements and substantive prohibitions.  *Id.* § 635(b)(1)(A).

23.     In particular, the Bank Act requires the Ex-Im Bank to consider, among other things, the adverse effect its commitments will have on U.S. industries and employment.  *Id.* §§ 635(b)(1), 635a-2.

24.     Subsection 635(e) of the Bank Act provides several limitations on the Bank's provision of loans or loan guarantees that "adversely affect[] the United States."  One of those limitations is found in § 635(e)(1), which prohibits the Bank from approving loans or loan guarantees that cause "substantial injury" to U.S. companies.  Another limitation is found in § 635(e)(7), which imposes certain notice-and-comment obligations "to reduce adverse effects of loans and guarantees on industries and employment in United States."

25.     These safeguards are necessary because Bank-backed loans offer foreign airlines extremely favorable terms — backed by the full faith and credit of the U.S. government — which offer a significant advantage to foreign recipients of the loans who compete against U.S. companies and workers.  Under the Ex-Im Bank's Direct Loan Program, foreign buyers of U.S. goods and services receive fixed-rate loans, generally at a rate that is "the lowest fixed-interest rate permitted for the importing country and term under the Arrangement on Guidelines for Officially Supported Export Credits negotiated among members of the Organization for Economic Cooperation and Development (OECD)."  Ex-Im Bank 2010 Annual Report at 30, *available at* http://www.exim.gov/about/reports/ar/index.cfm (last visited Nov. 13, 2011).

26.     Under the Ex-Im Bank's Loan Guarantee Program, a lender receives a guarantee from the U.S. government that the principal and interest on a loan will be paid in the event of a default by the borrower.  "Ex-Im Bank's comprehensive guarantee covers commercial and political risks for up to 85 percent of the U.S. contract value."  *Id.*

27.     The Bank Act requires the Ex-Im Bank to maintain a Board of Directors (the "Board").  *See* 12 U.S.C. § 635a(c).  Pursuant to the Bank Act, the Board has adopted bylaws that require the Ex-Im Bank to, among other things, hold regularly scheduled meetings for transacting business.  *See* Bylaws of the Export-Import Bank of the United States art. I, § 2 (effective as of Aug. 20, 1998), *available at* http://www.exim.gov/about/bylaws/index.cfm (last visited Nov. 13, 2011).  A majority vote of the Board members attending those meetings (of which three are needed for a quorum) constitutes an action of the Board.  *Id.* art. I, § 5.

28.     The APA provides a right of action against government agencies such as the Ex-Im Bank where their actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right;" or "without observance of procedure required by law."  *See* 5 U.S.C. §§ 702, 706(2)(A), (C), (D).

## FACTS

29.     The Ex-Im Bank has devoted a substantial portion of its financial commitments to aircraft financing.  From 2005 to 2010, the Bank has financed or guaranteed the financing for the purchases by foreign airlines of 634 aircraft, adding up to more than $34.5 billion in aircraft financing.  From 2007 to 2010, more than 60% of the Ex-Im Bank's total loan-guarantee portfolio was devoted to this purpose.

### A.     The Bank Makes $3.4 Billion In Air India Commitments

30.     On September 30, 2011, the last day of FY2011, the Ex-Im Bank announced that it had approved $1.3 billion in loan guarantees and $2.1 billion in preliminary commitments to support the commercial sale of 30 Boeing aircraft to Air India (the "Air India Commitments"). The Ex-Im Bank provided no other information regarding these massive loan guarantees or the review undertaken before it was approved.

31.     The Bank did not solicit public comment prior to approving the Air India Commitments.

32.     On November 1, 2011, the ATA submitted a letter to the Chairman and President of the Ex-Im Bank, Fred P. Hochberg, explaining in detail the harms caused by the Bank's aircraft-financing practices in general and the Air India Commitments in particular ("November 1 Letter").  In support of its letter, ATA submitted declarations from, among others, Richard H. Anderson, Chief Executive Officer of Delta and Chairman of the Board of Directors for ATA; Paul A. Jacobson, Senior Vice President of Finance and Treasurer of Delta; and two airline industry experts, Daniel M. Kasper of Compass Lexecon and John P. Heimlich, Vice President

and Chief Economist at ATA.  ATA's November 1 Letter and its exhibits are attached hereto as Exhibit 1 and incorporated by reference herein.

33.     On November 1, 2011, the Intervenor-Plaintiff Air Line Pilots Association, International ("ALPA") also sent a letter to the Bank.  ALPA voiced its support of ATA's letter and submitted a declaration from its Director of the Department of Economic & Financial Analysis, Ana McAhron-Schulz, describing the effect of the Bank's financing on jobs at U.S. airlines.  ALPA's letter is attached hereto as Exhibit 2 and incorporated by reference herein.

**B.     The Bank Fails To Provide Information Regarding This Massive Loan**

34.     On or about November 4, 2011, after receiving ATA's letter and ALPA's letter, the Bank approved and posted on its website a summary of minutes from the September 30, 2011, Board meeting.  *See* Export-Import Bank of the United States, Summary of Minutes of Meeting of Board of Directors, Sept. 30, 2011, *available at* http://www.exim.gov/article.cfm/26B599F6-B65F-578D-E9D3811D03BB829B/ (last visited Nov. 13, 2011).  Items 12A through 12C of those minutes provide scant detail regarding the Bank's approval of the Air India Commitments.  *See id.* ("Air India Minutes").

35.     On information and belief, the Bank has not finalized certain terms of the Air India Commitments.  In particular, the Air India Minutes list as the guaranteed lender a "financial institution acceptable to [the Ex-Im Bank], unknown ZZ."  *Id.*

36.     The Bank responded to ATA's November 1 Letter on November 10, 2011 ("November 10th Letter").  The Bank acknowledged that ATA had submitted a "voluminous amount[] of material in the form of personal declarations, studies and reports," and that the letter "will require detailed review and analysis in order to clarify the claims you have raised."  The Bank confirmed that the Air India final and preliminary commitments "have been considered by

the Board of Directors and, with regard to the final commitments, were fully and finally approved on September 30, 2011," and the Bank did not agree to reconsider those commitments. Moreover, the Bank stated that it would "not suspend consideration of *any* pending transactions while we review your letter and the allegations it contains."  (Emphasis added.)  Thus, the Air India Commitments and the Bank's policy decision not to consider ATA's comments prior to approving additional aircraft transactions constitute final agency action.  The Bank's November 10 Letter (which is confusingly dated November 8, 2011) is attached hereto as Exhibit 3 and incorporated by reference herein.

37.     On information and belief, the Ex-Im Bank has not released any other information about the Air India Commitments.

**C.     The Bank Routinely Fails To Provide Information About Its Commitments**

38.     Unfortunately, the lack of publicly available information about the Air India Commitments is consistent with the Bank's practice of not releasing information about pending applications.  The Ex-Im Bank does not disclose the names of loan applicants or any details regarding any pending transaction before placing such items on the agenda for discussion at a Board meeting.

39.     According to its website, the Ex-Im Bank "makes every attempt to release the agenda for the weekly Board of Directors meeting on Tuesday prior to the regularly scheduled Thursday meetings."  Export-Import Bank of the United States, Meeting of the Board of Directors Agenda, *available at* http://www.exim.gov/news/boardagenda.cfm (last visited Nov. 13, 2011).  The Bank's website cautions, however, that "Agenda topics, day and meeting times are subject to change without notice."  *Id.*

40.     The Ex-Im Bank's agenda announcements omit important information about transactions that will be considered at the Board meetings, such as the type and amount of the commitment to be considered, any lender in an application for a guarantee, or the domestic exporter that will allegedly benefit from the transaction.

41.     The Bank does not solicit public comment regarding loan guarantees for commercial aircraft.

42.     The Bank typically closes its regularly scheduled meetings to prevent the disclosure of information that it considers to be confidential.  On information and belief, the Bank prohibits members of the public from attending, observing, or otherwise participating in any of the Board's discussions regarding loan guarantees for commercial aircraft, including, but not limited to, the Air India Commitments.

43.     The Ex-Im Bank periodically releases minutes for its Board meetings.  Those minutes, typically state whether an application was approved or denied and disclose limited information about each application — such as the exporter, the lender, and the time period of the repayment term.  The Bank's minutes sometimes also include the financed amount or an estimate of the Bank's potential liability.

44.     On information and belief, the Bank's minutes for aircraft-related transactions (unlike its minutes for some other exported items) never disclose the financed amount or an estimate of the Bank's potential liability.  Consistent with that practice, the Air India Minutes do not disclose such information.

45.     On at least one occasion, the Bank released minutes that did not accurately reflect the Board's deliberations.  On November 3, 2011, the Bank released minutes from its September 30, 2011, Board meeting; those minutes omitted 15 of the 18 items that the Board considered

during that meeting.  ATA memorialized the Bank's mistakes in a letter to the Bank's General

Counsel, dated November 7, 2011 ("November 7 Letter").  ATA's November 7 Letter and its

exhibits are attached hereto as Exhibit 4 and incorporated by reference herein.

46.     On information and belief, the Ex-Im Bank has a policy of not releasing

information pursuant to Freedom of Information Act ("FOIA") requests regarding pending

applications for loans, loan guarantees, or insurance commitments.  The Bank avoids disclosing

such information by asserting that all of the details associated with every pending loan

application (including applicants' names) are protected from disclosure under FOIA's

"Exemption 4."  *See* 5 U.S.C. § 552(b)(4).

47.     The Ex-Im Bank is required to submit a "detailed statement" to Congress before

approving applications for financial guarantees that equal or exceed $100 million.  *See* 12 U.S.C.

§ 635(b)(3)(ii).  On information and belief, these statements are not publicly available, if at all,

until after the statutorily-required waiting period for approval has expired.

48.     As a result of the Bank's policies, a member of the public cannot obtain

meaningful information about pending loan applications pertaining to the export of aircraft

products, including application filing dates, specific aircraft products named, proposed loan and

repayment terms, or the dates on which the Ex-Im Bank plans to act on each currently pending

application (beyond those disclosed "on Tuesday prior to the regularly scheduled Thursday

meetings" and "subject to change without notice," *see* ¶ 39, *supra*).

49.     Because of the dearth of information available to the public regarding pending

applications for financing by foreign air carriers, and because the Bank excludes the public from

the Board's deliberations over such transactions, the public has no meaningful opportunity to

review or comment on these applications prior to their approval by the Board.  Accordingly, the Board is able to commit billions of U.S. taxpayer dollars without meaningful public input.

50.     The Bank also refuses to make publicly available the delivery dates for aircraft guaranteed by U.S. taxpayers.  ATA memorialized the Bank's position in a letter to the Bank's General Counsel, dated November 15, 2011.  The Bank's General Counsel confirmed the Bank's position in a response letter on the same date.  Both letters are attached hereto as Exhibit 5 and incorporated by reference herein.

51.     The Air India Commitments, however, exemplify the need for public oversight of the Bank's decisionmaking because, on information and belief, the Bank routinely ignores its statutory mandate to consider the negative impact that commitments to foreign air carriers have on ATA's members, their employees, and American taxpayers.

**D.     The Ex-Im Bank Failed Adequately To Consider The Adverse Effects Of Generous, Government-Sponsored Financing On The Domestic Airline Industry**

52.     Since 1995, competition between U.S. and foreign airlines has increased dramatically.  That increase in competition is due in part to various "open skies" agreements and accords entered into by the U.S. State Department.  All other things equal, head-to-head competition on international routes is good for the American public and for U.S. airlines, which are as efficient or more efficient than any airline in the world.

53.     The Bank's financing practices, however, have skewed the competitive playing field sharply in favor of foreign airlines.  Bank-backed foreign carriers are able to obtain aircraft financing at artificially low rates (that reflect a guarantee backed by the full faith and credit of the United States), whereas U.S. carriers must obtain market-based financing on their corporate credit rating alone.

54.     All other things being equal, financing the purchase of a Boeing 777 with a Bank guarantee will allow a foreign carrier to pay approximately $5 million less per year in interest payments than a U.S. carrier must pay.

55.     Because their financing costs are higher, U.S. carriers face a number of competitive disadvantages.  They have a more difficult time competing on price, are likely to keep older aircraft longer, and incur higher fuel and maintenance costs that come from flying older planes.

56.     U.S. airlines are currently competing on 125 nonstop international routes and hundreds of additional connecting routes with foreign airlines that received below-market financing from the Bank.

57.     The Bank's commitments also create a persistent oversupply of planes and a permanent reservoir of excess capacity.

58.     Since 2000, foreign airlines have taken delivery of nine times as many widebody aircraft as have U.S. carriers.  That ratio is expected to exceed 21 times by 2015.

59.     Bank-subsidized airlines have put approximately 12% more capacity into service in competition with U.S. airlines than they would have without the Ex-Im Bank's financing guarantees.

60.     Bank-enabled oversupply harms U.S. airlines.  The Ex-Im Bank's financing of foreign carrier capacity has caused a 4.1% decline in the international capacity of U.S. carriers.

61.     Delta's experience is illustrative.  In 2006, Delta offered nonstop service between New York and Mumbai.  Between 2006 and 2009, the Bank gave Air India loan guarantees totaling approximately $3.3 billion.  Those guarantees allowed Air India to flood the U.S.-India

market with extra capacity and crowd out competitors like Delta.  Delta stopped flying from New

York to Mumbai in October of 2008 due to the Bank's loan guarantees to Air India.

62.     Under the Bank Act, the Ex-Im Bank must "insure that full consideration is given

to the extent to which any loan or financial guarantee is likely to have an adverse effect on

industries . . . and employment in the United States."  12 U.S.C. § 635a-2; *see also id.* (requiring

the Bank to adopt regulations to carry out this inquiry); *id.* § 635(e)(7) (requiring the Bank to

provide notice-and-comment regarding its analysis of the "adverse effects of loans and

guarantees on industries and employment in United States").

63.     On information and belief, the Ex-Im Bank's means for complying with these

statutory obligations are its "Economic Impact Procedures."  *See* Export-Import Bank of the

United States Economic Impact Procedures (Apr. 2007), *available at*

http://www.exim.gov/products/policies/econ_impact_proc.cfm (last visited Nov. 13, 2011).

64.     Under the Bank's Economic Impact Procedures, all applications are subject to a

series of "screens" to determine "potential economic impact."  Under the first stage, the Bank

determines "if the exports involved in a transaction will result in the production of an exportable

good."  If they will not, the Bank does not conduct any further economic impact analysis.  In the

words of the Bank's Economic Impact Procedures, "only exports of capital goods and services

(e.g., manufacturing equipment, licensing agreements) that will result in the foreign production

of an exportable good are subject to further economic impact analysis in Stage II of these

procedures."

65.     On information and belief, the Ex-Im Bank does not consider applications filed by

foreign air carriers to warrant an economic impact analysis because the Bank does not consider

them to involve exports that "will result in the production of an exportable good."

66.     The Bank's practice of exempting all applications from an economic impact analysis that do not involve exports that "will result in the production of an exportable good" is plainly inconsistent with the text of the Bank Act and, in any event, is not a reasonable interpretation of the statute.

67.     According to the Bank's November 10 Letter, *see* ¶ 36, *supra*; Ex. 3, ATA provided a "voluminous amount[] of material in the form of personal declarations, studies and reports" regarding the adverse effects of the Bank's decisions on U.S. airlines.  The Bank has refused to reconsider the Air India Commitments in light of that evidence, and it will not consider that evidence before approving other, similar transactions.

**E.     The Ex-Im Bank Failed Adequately To Consider The Adverse Effects Of Generous, Government-Sponsored Financing On Domestic Employment**

68.     The Ex-Im Bank's subsidies to foreign airlines harm the employees of U.S. airlines.  Without the same access to cheap capital that Bank-backed foreign airlines enjoy, U.S. carriers must cut capacity, which requires cutting, among other things, American jobs.  For example, when Delta terminated its nonstop service between the U.S. and India as a result of overcapacity caused by the Bank, *see* ¶ 61, *supra*, it was also forced to furlough 64 highly experienced pilots.

69.     The Ex-Im Bank's subsidies to foreign carriers have forced U.S. airlines to cut between 4,100 and 7,500 jobs.

70.     The loss of those jobs has led to $372 million to $684 million in lost employee income.

71.     Every 100 airline jobs support approximately 360 jobs outside the aviation industry as well.  Thus, the lost jobs at U.S. airlines caused by the Bank's subsidies harm domestic employment more broadly.

72.     On information and belief, the harm to domestic jobs caused by the Bank's commitments outweighs any growth in U.S. jobs at Boeing Commercial Airplanes ("BCA"), which is the principal aircraft manufacturer in the United States.

73.     Domestic airlines employ roughly five times as many employees as Boeing does — approximately 389,000 to BCA's 74,000.

74.     Boeing's production process for new aircraft is heavily outsourced overseas. According to a recent report by the Inspector General for the U.S. Department of Transportation, only 4 of the 17 principal components of the Boeing 787's airframe are manufactured exclusively in the United States.  *See* Memorandum from David A. Dobbs, Principal Assistant Inspector General for Auditing and Evaluation, U.S. Department of Transportation, to Acting Federal Aviation Administrator, *Assessment of FAA's Risk-Based System for Overseeing Aircraft Manufacturers' Suppliers*, FAA Report No. AV-2008-026 (Feb. 26, 2008) (Ex. 1, at G-19 to G-49).  Everything else is manufactured in whole or in part overseas.  This outsourcing further reduces the benefit that the Bank's subsidies to foreign air carriers have on U.S. employment.

75.     Under the Bank Act, the Ex-Im Bank must give "full consideration" to any "adverse effect" a commitment will have on "employment in the United States" and adopt regulations to carry out such an inquiry.  12 U.S.C. § 635a-2; *see id.* § 635(b)(1)(B) (requiring the Board to "take into account any serious adverse effect of such loan or guarantee on . . . employment in the United States").

76.     According to the Bank's November 10 Letter, *see* ¶ 36, *supra*; Ex. 3, ATA provided a "voluminous amount[] of material in the form of personal declarations, studies and reports" regarding the adverse effects of the Bank's decisions on U.S. employment.  The Bank has refused to reconsider the Air India Commitments in light of that evidence, and it will not consider that evidence before approving other, similar transactions.

**F.     The Bank's Aircraft-Financing Decisions In General, And The Air India Commitments In Particular, Cause Substantial Injury To Domestic Air Carriers, Including Delta**

77.     The Bank Act prohibits the Ex-Im Bank from "extend[ing] any direct credit or financial guarantee for establishing or expanding production of any commodity for export by any country other than the United States," where the Bank determines that such commodity would "likely . . . be in surplus on world markets," would "compete with United States production of the same, similar, or competing commodity," and would "cause substantial injury to United States producers of the same, similar, or competing commodity."  *Id.* § 635(e)(1).

78.     The Bank Act provides the following definition in order to guide the Bank's substantial-injury determination:  "[T]he extension of any credit or guarantee by the Bank will cause substantial injury if the amount of the capacity for production established, or the amount of the increase in such capacity expanded, by such credit or guarantee equals or exceeds 1 percent of United States production."  *Id.* § 635(e)(4).

**i.     The Relevant Commodities Are Available Seats**

79.     Capacity in the airline industry is often measured in available daily seats.  Each additional aircraft placed into service with the Bank's support causes an increase in available daily seats.

18

80.     For purposes of the Bank Act, the available daily seats produced by U.S. carriers and the available daily seats produced by Bank-backed foreign carriers are competing commodities on many international routes.  In particular, U.S. airlines compete on 125 non-stop routes with foreign carriers that received financing from the Ex-Im Bank.  In 2010, these routes accounted for $5.8 billion in U.S. carrier revenues.

81.     U.S. carriers also compete with Bank-backed foreign carriers on hundreds of additional routes that U.S. carriers serve on a connecting basis.  Thus, the total amount of U.S.-carrier revenue exposed to competition from foreign carriers financed by the Ex-Im Bank is substantially greater than $5.8 billion.

####             ii.      Surplus

82.     Because of the Bank's decisions, available daily seats are in surplus on world markets.

83.     Since 2002, overall U.S. passenger traffic for long-haul international air travel (*i.e.*, demand) has remained essentially flat.

84.     The Bank has caused significant increases in supply.  In particular, capacity increases by Bank-backed foreign carriers have flooded international routes, including routes to the United States, and have crowded out U.S. carriers.

85.     The Bank's support for foreign carriers has caused dramatic increases in the size of those carriers' widebody fleets.  By 2015, foreign carriers are scheduled to take delivery of 1,157 widebody aircraft, 692 of which will be net additions to foreign carriers' fleets.  By comparison, U.S. carriers are scheduled to take delivery of only 55 widebody aircraft by 2015, only 7 of which will be net additions to U.S. carriers' fleets.

86.     Foreign carriers' capacity on international routes has grown almost six times faster than U.S. carriers' capacity in the last decade.  The dramatic discrepancies in the growth of foreign carriers' and U.S. carriers' widebody fleets will exacerbate that discrepancy.

87.     As noted above, *see* ¶ 59, *supra*, Bank financing has caused foreign carriers to increase capacity to the United States by approximately 12%.

88.     Between 2000 and 2010, the rate at which Bank-backed air carriers have added long-haul capacity to the United States was more than five times the rate of traffic growth.  That imbalance has created a surplus of available daily seats.

89.     Likewise, available seats on routes between India and the United States are in surplus.  The India-U.S. overcapacity problem is so large that 41-90% of Air India's total operating losses (which are substantial) came on routes to and from the United States.

90.     The Bank's support for Air India in 2006 created a surplus of available daily seats between Mumbai and John F. Kennedy Airport in New York.  The Air India Commitments would exacerbate that surplus.

### iii.     Substantial Injury

91.     The Air India Commitments will cause "substantial injury" to U.S. carriers that compete on international routes to and from India.

92.     U.S. airlines currently produce 1,296 available seats per day on routes between the United States and India.

93.     On information and belief, the Bank's Air India Commitments will cause that foreign carrier to add at least one daily round trip flight between India and the United States.

94.     One additional daily round trip flight between India and the United States would add at least 256 available seats per day, or 19% of the total U.S. capacity serving India.

95.     The increase of available seats on routes between the United States and India

caused by the Air India Commitments is therefore far in excess of the 1% threshold mandated by

statute.  *See* 12 U.S.C. § 635(e)(1)(B), (e)(4).

96.     The Bank's aircraft-financing policies more generally also have caused and will

continue to cause "substantial injury" to U.S. carriers.

97.     For example, in 2010, U.S. carriers offered approximately 65,000 daily long-haul

international seats.

98.     Foreign carrier recipients of financing from the Ex-Im Bank offered 28,136 daily

long haul seats.  The 12% increase in foreign carrier capacity to the United States attributable to

financing from the Ex-Im Bank, *see* ¶ 87, *supra*, thus represented approximately 3,000 daily

long-haul seats.

99.     The amount of the increase in long-haul capacity attributable to financing from

the Ex-Im Bank (3,000 daily seats) therefore far exceeds 1% of U.S. production (650 daily seats)

of long-haul capacity.

100.    Therefore, every additional long-haul daily seat made available on account of the

Bank's financing exacerbates the "substantial injury" that the Bank has already caused to U.S.

carriers and compounds the Bank's violations of its statutory obligations.

101.    According to the Bank's November 10 Letter, *see* ¶ 36, *supra*; Ex. 3, ATA

provided a "voluminous amount[] of material in the form of personal declarations, studies and

reports" regarding the substantial injury that the Bank's aircraft-related financing policies have

imposed on U.S. carriers in general, as well as the substantial injury that would be caused by the

Air India Commitments in particular.  The Bank has refused to reconsider the Air India

Commitments in light of that evidence, and it will not consider that evidence before approving other, similar transactions.

## COUNT I

### (Violation of Bank Act and APA:  Adverse Effect on Domestic Industry from Air India Commitments)

102.     All preceding paragraphs 1 through 101 are repeated, realleged, and incorporated herein.

103.     The Ex-Im Bank violated the Bank Act by approving the Air India Commitments without considering the extent to which they are likely to have an adverse effect on the domestic airline industry.  *See* 12 U.S.C. §§ 635(b)(1)(B), 635a-2.

104.     The Ex-Im Bank's violation of the Bank Act is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), and/or "without observance of procedure required by law," *id.* § 706(2)(D).

## COUNT II

### (Violation of Bank Act and APA:  Adverse Effect on Domestic Employment from Air India Commitments)

105.     All preceding paragraphs 1 through 104 are repeated, realleged, and incorporated herein.

106.     The Ex-Im Bank violated the Bank Act by approving the Air India Commitments without considering the extent to which they are likely to have an adverse effect on domestic employment.  *See* 12 U.S.C. §§ 635(b)(1)(B), 635a-2.

107.     The Ex-Im Bank's violation of the Bank Act is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), and/or

"without observance of procedure required by law," *id.* § 706(2)(D).

## COUNT III

### (Violation of Bank Act and APA:  Substantial Injury to Domestic Industry from Air India Commitments)

108.     All preceding paragraphs 1 through 107 are repeated, realleged, and incorporated herein.

109.     The Ex-Im Bank approved the Air India Commitments without considering whether they cause a substantial injury to the domestic airline industry.  *See* 12 U.S.C. § 635(e)(1), (4).

110.     The Ex-Im Bank's violation of the Bank Act is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

## COUNT IV

### (Violation of Bank Act and APA:  Failure To Provide Notice and Comment Regarding the Air India Commitments)

111.     All preceding paragraphs 1 through 110 are repeated, realleged, and incorporated herein.

112.     The Ex-Im Bank approved the Air India Commitments without providing notice, soliciting comment, and providing a reasoned explanation for its decision.  *See* 12 U.S.C. § 635(e)(7).

113.     The Ex-Im Bank's violation of the Bank Act is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or

"without observance of procedure required by law," *id.* § 706(2)(D).

### COUNT V

### (Violation of Bank Act and APA:  Adverse Effect on Domestic Industry from Guarantees for Foreign Airlines)

114.     All preceding paragraphs 1 through 113 are repeated, realleged, and incorporated herein.

115.     The Ex-Im Bank has a policy of approving loan guarantees for foreign airlines without considering the extent to which they are likely to have an adverse effect on the domestic airline industry.  *See* 12 U.S.C. §§ 635(b)(1)(B), 635a-2.

116.     The Ex-Im Bank's violations of the Bank Act are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

### COUNT VI

### (Violation of Bank Act and APA:  Adverse Effect on Domestic Employment from Guarantees for Foreign Airlines)

117.     All preceding paragraphs 1 through 116 are repeated, realleged, and incorporated herein.

118.     The Ex-Im Bank has a policy of approving loan guarantees for foreign airlines without considering the extent to which they are likely to have an adverse effect on domestic employment.  *See* 12 U.S.C. §§ 635(b)(1)(B), 635a-2.

119.     The Ex-Im Bank's violations of the Bank Act are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or

"without observance of procedure required by law," *id.* § 706(2)(D).

## COUNT VII

### (Violation of Bank Act and APA:  Substantial Injury to Domestic Industry from Guarantees for Foreign Airlines)

120.    All preceding paragraphs 1 through 119 are repeated, realleged, and incorporated

herein.

121.    The Ex-Im Bank has a policy of approving loan guarantees for foreign airlines

without considering whether they cause a substantial injury to the domestic airline industry.  *See*

12 U.S.C. § 635(e)(1), (4).

122.    The Ex-Im Bank's violations of the Bank Act are "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or

"without observance of procedure required by law," *id.* § 706(2)(D).

## COUNT VIII

### (Violation of Bank Act and APA:  Failure To Provide Notice and Comment Regarding Guarantees for Foreign Airlines)

123.    All preceding paragraphs 1 through 122 are repeated, realleged, and incorporated

herein.

124.    The Ex-Im Bank has a policy of approving loan guarantees for foreign airlines

without providing notice, soliciting comment, and providing a reasoned explanation for its

decision.  *See* 12 U.S.C. § 635(e)(7).

125.    The Ex-Im Bank's violations of the Bank Act are "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of

25

statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or

"without observance of procedure required by law," *id.* § 706(2)(D).

## COUNT IX

### (Temporary Restraining Order
### and Preliminary Injunction)

126.    All preceding paragraphs 1 through 125 are repeated, realleged, and incorporated herein.

127.    ATA and Delta can meet their burden of proof on all the requirements for the issuance of a temporary restraining order and a preliminary injunction.

128.    ATA and its U.S. operator members, including Delta, are being irreparably harmed by the Ex-Im Bank's unlawful conduct.  ATA and its U.S. operator members, including Delta, have no adequate remedy at law.

129.    The harm to ATA and Delta outweighs the harm, if any, to the Ex-Im Bank by the issuance of a temporary restraining order and a preliminary injunction.

130.    ATA and Delta are substantially likely to prevail on the merits of its claims.

131.    Public policy and the public interest favor the issuance of the requested temporary restraining order and a preliminary injunction.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ATA and Delta request the following relief:

A.    A declaration that defendants violated and are in violation of the Bank Act and the APA for failing to comply with the Bank Act;

B.    Injunctive relief including:

(i)     an order that the approved Air India Commitments are unlawful for failure to comply with the Bank Act and the APA;

(ii)    an order prohibiting the Ex-Im Bank from issuing guarantees on its Air India Commitments;

(iii)   an order requiring the defendants to prepare domestic-industry studies in support of their Air India Commitments;

(iv)    an order requiring the defendants to prepare domestic-employment studies in support of their Air India Commitments;

(v)     an order requiring the defendants to prepare substantial-injury studies in support of their Air India Commitments;

(vi)    an order prohibiting the defendants from issuing guarantees on its Air India Commitments to the extent that those commitments will cause substantial injury to U.S. companies;

(vii)   an order requiring the defendants to provide public notice and comment regarding their domestic-industry, domestic-employment, and substantial-injury studies in support of their Air India Commitments;

C.      An award of costs, fees, and reasonable attorneys' fees; and

D.      Such other legal and equitable relief as the Court deems just and proper.

Date:  February 17, 2012                    Respectfully submitted,

Michael K. Kellogg (Bar No. 372049)
Wan J. Kim (Bar No. 454269)
Andrew S. Oldham (Bar No. 999098)
W. Joss Nichols (Bar No. 1001126)
**KELLOGG, HUBER, HANSEN, TODD,
 EVANS & FIGEL, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@khhte.com

*Attorneys for Plaintiffs Air Transport
 Association of America, Inc. and Delta
 Air Lines, Inc.*

28

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2012, I emailed the foregoing First Amended Complaint for Declaratory and Injunctive Relief and Exhibits to the Clerk of Court, whose entry of the documents onto the docket will cause them to be served on all counsel of record by means of the Court's ECF system.

W. Joss Nichols