UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AIR TRANSPORT ASSOCIATION OF AMERICA**, *et al.*, **Plaintiffs,** v. **EXPORT-IMPORT BANK OF THE UNITED STATES**, *et al.*, **Defendants.** | Civil Action No.  11-2024 (JEB) |

## MEMORANDUM OPINION

The Export-Import Bank of the United States has long been in the business of issuing loan guarantees to support foreign airlines' purchases of aircraft from domestic manufacturers. While the Bank's involvement in the air-travel industry undoubtedly serves the interests of U.S. aircraft manufactures, those interests do not necessarily align with the interests of U.S. airlines and their employees. The manufacturers appreciate the help in selling their planes to foreign buyers, but the airlines resent the boost this provides to their competitors. When in 2011 the Bank approved a series of guarantees to support Air India's purchase of planes from Boeing, organizations representing some of those domestic airlines and their employees brought this suit. These Plaintiffs claim that the manner in which the Bank processes loan-guarantee applications from foreign airlines is inconsistent with its obligations under the Export-Import Bank Act. In particular, they maintain that the Bank violated both the Bank Act and the Administrative Procedure Act when it approved the 2011 Air India guarantees.

Back in January, the Court rejected Plaintiffs' Motion for Preliminary Injunction because they had failed to demonstrate that they would suffer irreparable harm during the pendency of

1

this suit.  Both sides have now filed dispositive motions.  In resolving them, the Court must

tackle important and difficult questions about constitutional standing, the role of the courts *vis-à-*

*vis* the Export-Import Bank, and the nature of the Bank's obligations under the Bank Act.  In the

end, it finds that Plaintiffs have established standing and that the Bank's loan-guarantee

determinations are, at least in a limited sense, subject to judicial review.  But after winning these

battles, Plaintiffs lose the war.  When all is said and done, the Bank's decision to approve the Air

India Commitments was neither arbitrary and capricious nor contrary to law.  Summary

judgment will thus be entered in Defendants' favor.

## I.    Background

### A.  THE EXPORT-IMPORT BANK

The Export-Import Bank of the United States is an independent federal agency and

corporation that has its origins in a 1934 Executive Order issued by then-President Franklin

Roosevelt.  See Exec. Order No. 6581 (Feb. 2, 1934).  The Bank assumed its current form with

the passage of the Export-Import Bank Act of 1945 (Bank Act), ch. 341, 59 Stat. 526, which, as

amended and codified at 12 U.S.C. § 635 *et seq.*, remains the Bank's governing charter.  That

statute provides that "[t]he objects and purposes of the Bank shall be to aid in financing and to

facilitate exports of goods and services, imports, and the exchange of commodities and services

between the United States . . . and any foreign country . . . , and in so doing to contribute to the

employment of United States workers."  12 U.S.C. § 635(a)(1).  Consistent with these goals, the

Bank is empowered "to provide guarantees, insurance, and extensions of credit."  Id. §

635(b)(1)(A).  Loans and guarantees issued by the Bank carry the full faith and credit of the

United States government.  Id. § 635k.

In order to carry out its business, the Bank is required to maintain a Board of Directors,

which must consist of the Bank's President, its Vice President, and three additional persons.  See

id. § 635a(c).  A company seeking Bank financing may apply to the Board for approval of either

a preliminary or a final commitment.  See Defs.' Mot., Exh. H (Third Decl. of Robert Morin), ¶¶

26, 29.  If a majority of the Board's members so votes, an application for a preliminary

commitment is approved.  See Bylaws of the Export-Import Bank of the United States, art. I, § 5

(effective Aug. 20, 1998), available at http://www.exim.gov/about/bylaws/index.cfm.  Obtaining

a preliminary commitment allows a company to engage in long-term planning, and preliminary

commitments may be converted into final commitments by another majority vote of the Board.

Third Morin Decl., ¶¶ 31, 33.  New commitments of more than $100 million require an

additional step: they can be finalized only after Congress has been given the opportunity to

review and comment on the transaction.  12 U.S.C. § 635(b)(3); see also Third Morin Decl., ¶ 34.

　　　　In deciding whether to approve an application for a financial commitment, the Board

must consider both the financial wisdom of the loan or guarantee, as well as its impact on U.S.

industry and employment.  See generally 12 U.S.C. § 635 et seq.  For example, the statute

provides that the Bank shall only make loans that, "in the judgment of the Board of Directors,

offer reasonable assurance of repayment."  Id. § 635(b)(1)(B); see also id. § 635j(a).  And, more

relevant to the instant dispute, it specifies that the Bank must "take into account any serious

adverse effect of such loan or guarantee on the competitive position of United States industry . . .

and employment . . . and shall give particular emphasis to the objective of strengthening the

competitive position of United States exporters and thereby of expanding total United States

exports."  Id. § 635(b)(1)(B).

　　　　These are not the only limitations the Bank Act places on the Bank's operations, nor are

they the only provisions at issue in this suit.  In analyzing Plaintiffs' claims the Court will

individually discuss each portion of the statute on which those claims rely, but, at this juncture, it

is sufficient to say that various provisions of the statute require the Bank to consider the ways in which its transactions affect domestic industry and employment.

The Bank's "means for complying with these statutory obligations are its 'Economic Impact Procedures'" (EIPs).  ATA & Delta's Am. Compl., ¶ 64; ALPA's Compl., ¶ 60; see Export-Import Bank of the United States Economic Impact Procedures (Apr. 2007), available at http://www.exim.gov/products/policies/econ_impact_proc4-07.pdf.  The EIPs are comprised of a series of five "screens" that aim to identify the "potential economic impact" of prospective commitments.  See EIPs at 1; ATA & Delta's Am. Compl., ¶ 65; ALPA's Compl., ¶ 61.  The "Ex-Im Bank reviews all transactions it receives" for such impact by applying these screens. EIPs at 1.  Only those transactions that are not exempted by any of the five screens are put "through a more extensive process" to further explore their potential economic impact.  Id.  In other words, if a transaction is exempted by a screen, it need not undergo further economic-impact scrutiny.  See id.  At issue in this case is the first of those screens, which qualifies a transaction for further scrutiny only "if the exports involved in [that] transaction will result in the production of an exportable good."  Id.  It was the application of this screen that exempted the Air India Commitments and led to Plaintiffs' claim of injury.

B.  THE AIR INDIA COMMITMENTS

Loans and loan guarantees that support domestic aircraft manufacturing comprise a substantial portion of the Bank's transactions.  See ATA & Delta's Am. Compl., ¶ 29; ALPA's Compl., ¶ 28.  Such guarantees allow foreign airlines to obtain credit at lower interest rates, which in turn provides them with an incentive to purchase American planes instead of planes manufactured abroad.  See ATA & Delta's Am. Compl., ¶¶ 25, 53-54; ALPA's Compl., ¶¶ 24, 51-52.  This benefits American manufacturers by providing additional buyers for their wares.  To give a sense of the scale of the Bank's involvement in financing foreign airlines' purchase of

domestic aircraft, between 2005 and 2010 the Bank "financed or guaranteed the financing for purchases by foreign airlines of 634 aircraft, adding up to more than $34.5 billion."  ATA & Delta's Am. Compl., ¶ 29; ALPA's Compl., ¶ 28.

Plaintiffs contend that these transactions have caused them competitive injury.  See ATA & Delta's Am. Compl., ¶¶ 52-61, 77-101; ALPA's Compl., ¶¶ 50-58, 73-97.  As direct competitors of Air India, ATA's members, including Delta, claim that the benefits the Bank's practices have conferred on foreign airlines have put them at a competitive disadvantage and caused them direct financial harm.  See ATA & Delta's Am. Compl., ¶¶ 52-61, 77-101.  The financial injuries incurred by the airlines, furthermore, have also been felt by the airlines' employees, including the pilots that the Air Line Pilots Association (ALPA) represents.  See ATA & Delta's Am. Compl., ¶¶ 67-76; ALPA's Compl., ¶¶ 64-72.  Plaintiffs contend that "[t]he Ex-Im Bank's subsidies to foreign carriers have forced U.S. airlines to cut between 4,100 and 7,500 jobs."  ATA & Delta's Am. Compl., ¶ 69; see ALPA's Compl., ¶ 66.

At particular issue in this suit are $3.4 billion in preliminary and final commitments approved by the Board on September 30, 2011.  See ATA & Delta's First Am. Compl., ¶ 30; Administrative Record (A.R.) at 29-30.  The $1.3 billion in final commitments were conversions of preliminary commitments originally approved in 2006 and intended to support Air India's purchase of Boeing 787 aircraft.  See A.R. at 31.  The remaining $2.1 billion in preliminary commitments will support the airline's acquisition of Boeing 787 and 777-300ER planes.  See id. These are "widebody," "medium-sized aircraft (200 to 300 seats) with a range (7,500 nautical miles to 8,500 nautical miles) that previously has only been available with much larger aircraft." Id. at 67.

C.  THE CURRENT ACTION

Plaintiff ATA is a trade organization, headquartered in Washington, D.C., that represents

United States airlines.  See ATA & Delta's First Am. Compl., ¶ 11.  ATA's members include

AirTran Airways; Alaska Airlines, Inc.; ASTAR Air Cargo, Inc.; Delta Air Lines, Inc.;

Evergreen International Airlines, Inc.; Hawaiian Airlines; JetBlue Airways Corp.; Southwest

Airlines Co.; U.S. Airways, Inc.; United Air Lines, Inc.; Continental Airlines, Inc.; American

Airlines, Inc.; Atlas Air, Inc.; Federal Express Corp.; and United Parcel Service Co.  Id., ¶ 11

n.*.  ATA "work[s] with its members in legal, political, and regulatory arenas to foster a business

and regulatory environment that promotes a safe, secure, and financially successful U.S. airline

industry."  Id., ¶ 11.

ATA filed its Complaint on behalf of nine of its member airlines.  See id., ¶ 11 n.*.  Six

of those members, United, Continental, American, Atlas Air, FedEx, and United Parcel Service,

declined to join the suit.  Id.  One of those members, Delta, joined the Complaint as an individual

Plaintiff.  "Delta is a domestic air carrier" that "competes with Air India for passengers traveling

to and from international destinations."  Id., ¶ 12.

Plaintiff-Intervenor ALPA is an unincorporated labor organization, also based in

Washington, D.C., that represents "approximately 47,000 pilots employed by 28 United States

commercial airlines."  ALPA's Compl., ¶ 11.  ALPA's members include pilots that work for

airlines that provide "significant international services[,] . . . including Alaska, Continental,

Delta, FedEx, Hawaiian, and United."  Id.  ALPA's Complaint is nearly identical to that filed by

ATA and Delta.

Both Complaints charge the Bank and senior Bank officials with violating the APA by acting arbitrarily and capriciously and violating various provisions of the Bank Act.[1]  Plaintiffs' claims fall generally into three categories.  First, Plaintiffs allege that Defendants violated 12 U.S.C. §§ 635(b)(1)(B) and 635a-2 by "approving the Air India Commitments without considering the extent to which they are likely to have an adverse effect on the domestic airline industry" and on "domestic employment."  ATA & Delta's Am. Compl., ¶ 103; ALPA's Compl., ¶ 99.  Second, they contend that the Bank violated § 635(e)(1) when it "approved the Air India Commitments without considering whether they cause a substantial injury to the domestic airline industry."  ATA & Delta's Am. Compl., ¶ 109; see ALPA's Compl., ¶ 105.  Third, Plaintiffs claim that the Bank violated § 635(e)(7) by approving the Air India Commitments "without providing notice, soliciting comment, and providing a reasoned explanation for its decision."  ATA & Delta's Am. Compl., ¶ 112; ALPA's Compl., ¶ 108.  Plaintiffs argue both that these violations occurred with respect to the Air India Commitments specifically and that the Bank's policies regarding foreign-airline transactions generally conflict with the Bank Act and the APA.

Along with their initial Complaint, ATA and Delta filed a Motion for Temporary Restraining Order and Motion for Preliminary Injunction, both of which claimed that expeditious relief was required due to the impending delivery of aircraft from Boeing to Air India.  See Mot. for TRO & PI at 3.  On November 16, 2011, Chief Judge Royce Lamberth denied the Motion for TRO because, "[i]n absence of the administrative record relied upon by the defendant Export-Import Bank in approving the loan guarantees at issue, the Court cannot satisfy itself that plaintiff has shown a [sufficient] likelihood of success of the merits."  Air Transp. Assoc. of America, Inc. v. Export-Import Bank of the United States, No. 11-2024 (D.D.C. Nov. 16, 2011)

---

[1] The individual Defendants are Fred P. Hochberg, in his official capacity as Chairman and President of the Bank; Wanda Felton, in her official capacity as First Vice President and Vice Chair of the Bank; and Sean Mulvaney, in his official capacity as a member of the Bank's Board of Directors.

(order denying temporary restraining order).  Chief Judge Lamberth ordered Defendants to file the administrative record with the Court, id., and Defendants did so on November 29, 2011.

Following briefing and a hearing, this Court denied Plaintiffs' Motion for Preliminary Injunction on January 13, 2012, primarily on the ground that Plaintiffs had failed to "demonstrate[ ] a likelihood that they will suffer irreparable harm during the pendency of the lawsuit in the absence of an injunction."  See Air Transp. Assoc. of America, Inc. v. Export-Import Bank of the United States., --- F. Supp. 2d ---, 2012 WL 119557, at *1 (D.D.C. Jan. 13, 2012).  Plaintiffs have now filed Motions for Summary Judgment, and Defendants have filed a Motion to Dismiss or for Summary Judgment.  It is to the resolution of these Motions that the Court now turns.

## II.    Legal Standard

Whereas Plaintiffs' Motions are for summary judgment only, Defendants' Motion seeks both dismissal and, in the alternative, summary judgment.  Taken together, the three motions are brought pursuant to three different Federal Rules of Civil Procedure and thus implicate three distinct standards of review.  Defendants' argument that Plaintiffs lack standing will be adjudicated under the standard applicable to Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction.  Defendants' argument that Plaintiffs' claims are not justiciable under the APA's "committed to agency discretion" exception, conversely, will be resolved in accordance with Rule 12(b)(6).  Finally, both parties' seek summary judgment on the merits, which will be adjudicated consistent with the summary-judgment and APA standards enumerated in Part II.B, infra.

### A.  Motion to Dismiss

In evaluating Defendants' Motion to Dismiss, the Court must "treat the [C]omplaint[s'] factual allegations as true . . . and must grant [P]laintiff[s] 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005). This standard governs the Court's considerations of Defendants' Motion under both Rules 12(b)(1) and 12(b)(6). See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader"); Walker v. Jones, 733 F.2d 923, 925-26 (D.C. Cir. 1984) (same). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (internal quotation marks omitted).

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint "fail[s] to state a claim upon which relief can be granted." Although the notice pleading rules are "not meant to impose a great burden on a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation omitted). Plaintiffs must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Though Plaintiffs may survive a

12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 565

(citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts alleged in their Complaints "must

be enough to raise a right to relief above the speculative level." Id. at 555.

To survive a motion to dismiss under Rule 12(b)(1), Plaintiffs bear the burden of proving

that the Court has subject-matter jurisdiction to hear their claims.  See Lujan v. Defenders of

Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24

(D.C. Cir. 2000).  A court has an "affirmative obligation to ensure that it is acting within the

scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185

F. Supp. 2d 9, 13 (D.D.C. 2001).  "For this reason 'the [p]laintiff's factual allegations in the

complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a

12(b)(6) motion for failure to state a claim."  Id. at 13-14 (quoting 5A Charles A. Wright &

Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)).

Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider

materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of

jurisdiction."  Jerome Stevens, 402 F.3d at 1253; see also Venetian Casino Resort, LLC v.

EEOC, 409 F.3d 359, 366 (D.C. Cir. 2005) ("given the present posture of this case – a dismissal

under Rule 12(b)(1) on ripeness grounds – the court may consider materials outside the

pleadings"); Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

B. Motion for Summary Judgment

Summary judgment may be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S.

at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby,

Inc., 477 U.S. at 248; Holcomb, 433 F.3d at 895.

Although styled as Motions for Summary Judgment, the pleadings in this case more

accurately seek the Court's review of an administrative decision.  The standard set forth in Rule

56(c), therefore, does not apply because of the limited role of a court in reviewing the

administrative record.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006)

(citing National Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7

(D.D.C. 2005); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995), amended on

other grounds, 967 F. Supp. 6 (D.D.C. 1997)).  "[T]he function of the district court is to

determine whether or not as a matter of law the evidence in the administrative record permitted

the agency to make the decision it did."  Sierra Club, 459 F. Supp. 2d at 90 (quoting Occidental

Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985)) (internal quotation marks omitted).

Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the

agency action is supported by the administrative record and otherwise consistent with the APA

standard of review.  See Richards v. INS, 554 F.2d 1173, 1177 (D.C. Cir. 1977), cited in Bloch

v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

The Administrative Procedure Act "sets forth the full extent of judicial authority to

review executive agency action for procedural correctness."  FCC v. Fox Television Stations,

Inc., 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action,

findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law."  5 U.S.C. § 706(2)(A).  This is a "narrow" standard of review as courts

defer to the agency's expertise.  <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.</u>

<u>Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).  An agency is required to "examine the relevant data and

articulate a satisfactory explanation for its action including a rational connection between the

facts found and the choice made."  <u>Id.</u> (internal quotation omitted).  The reviewing court "is not

to substitute its judgment for that of the agency," <u>id.</u>, and thus "may not supply a reasoned basis

for the agency's action that the agency itself has not given."  <u>Bowman Transp., Inc. v. Arkansas-</u>

<u>Best Freight Sys., Inc.</u>, 419 U.S. 281, 285-86 (1974).  Nevertheless, a decision that is not fully

explained may be upheld "if the agency's path may reasonably be discerned."  <u>Id.</u> at 286.

## III.   Analysis

Plaintiffs claim that the Ex-Im Bank and its officers violated various provisions of the

Bank Act and, by extension, the APA when they approved the 2011 Commitments to Air India.

But Defendants correctly point out that before the Court can reach the merits of Plaintiffs'

claims, it must first ensure that it has jurisdiction to decide them.  <u>See, e.g.</u>, <u>Dominguez v. UAL</u>

<u>Corp.</u>, 666 F.3d 1359, 1362 (D.C. Cir. 2012) ("[E]very federal court has a 'special obligation to

satisfy itself' of its own jurisdiction before addressing the merits of any dispute.") (quoting

<u>Bender v. Williamsport Area Sch. Dist.</u>, 475 U.S. 534, 541 (1986)).  The Court's analysis will

thus begin with the question of Plaintiffs' standing, which the Court has previously recognized

raises "serious questions."  <u>ATA</u>, 2012 WL 119557, at *1.  Ultimately concluding that Plaintiffs

do have constitutional and prudential standing to pursue their claims, the Court will next address

another potential obstacle to its review of the merits: Defendants' contention that the Bank's

loan-guarantee determinations are "committed to agency discretion," 5 U.S.C. § 701(a)(2), and

thus not subject to judicial review.  Again, it finds that Plaintiffs have the better of the argument.

While the Court's role in reviewing the Bank's decision is undoubtedly limited, loan-guarantee

determinations are not entirely committed to the Bank's discretion, and the Court thus has some part to play in ensuring the Bank abides by the limitations that Congress has set forth.  Having cleared away those significant threshold questions, the Court will then reach the merits of Plaintiffs' allegations.  In the end, it determines that the Bank acted neither arbitrarily and capriciously nor contrary to its governing statute when it approved the 2011 Commitments to Air India.

A.  STANDING

Article III of the Constitution limits the power of the federal judiciary to the resolution of "Cases" and "Controversies."  U.S. Const. art. III, § 2; see also Allen v. Wright, 468 U.S. 737, 750 (1984) (discussing the case-or-controversy requirement).  "This limitation is no mere formality: it 'defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded.'"  Dominguez, 666 F.3d at 1361 (quoting Allen, 468 U.S. at 750).  Because "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), finding that a plaintiff has standing is a necessary "predicate to any exercise of [the Court's] jurisdiction."  Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996).

"Every plaintiff in federal court," consequently, "bears the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability."  Dominguez, 666 F.3d at 1362 (quoting Lujan, 504 U.S. at 560-61).  Taken together, these elements require a plaintiff to demonstrate the existence of a "personal injury fairly traceable to the [opposing party's] allegedly unlawful conduct and likely to be redressed by the requested relief."  Allen, 468 U.S. at 751.  In addition to the constitutionally derived test for standing, Plaintiffs must also satisfy "the judicially created zone-

of-interests test for standing." Patchak v. Salazar, 632 F.3d 702, 704 (D.C. Cir. 2011).  This

latter test, which was originally characterized as a "gloss" on § 702 of the Administrative

Procedure Act, see Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 395-96 (1987) (interpreting 5

U.S.C § 702), requires a plaintiff to demonstrate that its suit seeks to protect an interest that is

"arguably within the zone of interests to be protected" by the relevant statutory provisions.  See

Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 492 (1998) (quoting

Assoc. of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)) (emphasis in

original).

     All three Plaintiffs – ATA, Delta, and ALPA – bring substantively identical claims in

nearly identical language.  Compare ATA & Delta's First Am. Compl., ¶¶ 102-25, with ALPA's

Compl., ¶¶ 98-121.  Where multiple plaintiffs bring the same claims, the Court need only ensure

that one of those plaintiffs has standing to pursue them.  See Mountain States Legal Found. v.

Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996) ("[I]f constitutional and prudential standing can

be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to

raise that claim.").  Because Delta is one of ATA's members and any injury accruing to ALPA's

pilots derives from the airlines' injury, ATA is best positioned to demonstrate standing.  If any of

these Plaintiffs have standing, in other words, it will be ATA.

     As an association, ATA has standing to challenge the Ex-Im Bank's decision if three

conditions are met: 1) at least one of its members would have standing to sue; 2) the interests the

organization seeks to protect are germane to its purpose; and 3) neither the claim nor the

requested relief requires its individual members' participation.  See Hunt v. Washington State

Apple Adver. Comm'n, 432 U.S. 333, 343 (1977); United Food and Commercial Workers Union

Local 751 v. Brown Group, Inc., 517 U.S. 544, 552-55 (1996).  It is undisputed that ATA

satisfies the second and third elements of this test.  As "the principal trade association representing scheduled airlines in the United States," "ATA's purposes include working with its members in legal, political, and regulatory arenas to foster a business and regulatory environment that promotes a safe, secure, and financially successful U.S. airline industry." ATA & Delta's First. Am. Compl., ¶ 11.  Because this suit is brought to protect domestic airlines' financial interests, it clearly implicates interests germane to ATA's purpose.  And as ATA's claims concern the interests of domestic airlines generally and declaratory and injunctive relief – not money damages – are the remedies sought, see id. at 26-27, the Court conceives of no reason why the participation of ATA's individual members should be required.  Cf. Warth v. Seldin, 422 U.S. 490, 515-16 (1975) (where association seeks "prospective relief," courts assume remedy "will inure to the benefit of those members . . . actually injured," and, accordingly, individual participation not required).

The first prong – whether ATA's members would have standing to sue in their own right – is thus all that remains.  To proceed, then, ATA must demonstrate that at least one of its members would satisfy both the constitutional and the prudential tests for standing, see, e.g., Util. Air Regulatory Group v. EPA, 320 F.3d 272, 277 (D.C. Cir. 2003), and the Court will address these two sets of requirements separately.  Although "standing . . . is ordinarily substantially more difficult to establish" where, as here, "the plaintiff is not himself the object of the government action . . . he challenges, Summers v. Earth Island Institute, 555 U.S. 488, 493 (2009) (quoting Lujan, 504 U.S. at 562) (internal quotation marks omitted), the Court ultimately concludes that ATA has constitutional and prudential standing to challenge the Ex-Im Bank's 2011 Commitments to Air India.

1.  *Constitutional Standing*

To repeat, to establish constitutional standing ATA's members must satisfy three requirements: injury in fact, causation, and redressability.  The Court will consider these in sequence.

a.  <u>Injury in Fact</u>

To establish an "injury in fact," ATA's members must identify "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  <u>Lujan</u>, 504 U.S. at 560 (internal citations and quotations omitted).  It is well established in this Circuit that "economic actors 'suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition' against them."  <u>Sherley v. Sebelius</u>, 610 F.3d 69, 72 (D.C. Cir. 2011) (quoting <u>La. Energy & Power Auth. v. FERC</u>, 141 F.3d 364, 367 (D.C. Cir. 1998)) (alteration in original); <u>see also</u> <u>New World Radio, Inc. v. FCC</u>, 294 F.3d 164, 172 (D.C. Cir. 2002) ("basic law of economics" that increased competition leads to actual injury).  This so-called competitor-injury doctrine "recognizes probable economic injury resulting from [governmental actions] that alter competitive conditions as sufficient to satisfy the [Article III 'injury-in-fact' requirement]."  <u>Clinton v. City of New York</u>, 524 U.S. 417, 433 (quoting 3 K. Davis & R. Pierce, <u>Administrative Law Treatise</u> 13-14 (3d ed. 1994)) (alterations in original).

The D.C. Circuit's "cases addressing competitor standing have articulated various formulations of the standard for determining whether a plaintiff asserting competitor standing has been injured."  <u>Sherley</u>, 610 F.3d at 73.  It is clear, though, that the injury-in-fact requirement may be satisfied before an injury from increased competition actually occurs.  <u>See</u> <u>id.</u> at 72.  "Because increased competition almost surely injures a seller in one form or another, he need not wait until 'allegedly illegal transactions . . . hurt [him] competitively' before challenging the

regulatory . . . governmental decision that increases competition." Id. (quoting La. Energy, 141 F.3d at 367) (alteration in original).  So long as a plaintiff can demonstrate an "imminent increase in competition," the court recognizes that that "increase . . . will almost certainly cause an injury in fact." Id. at 73.  It is crucial, however, that the increase in competition and corresponding injury be "imminent," not merely "speculative." Compare La. Energy, 141 F.3d at 367 (finding competitor standing where injury was "imminent"), and Sherley, 610 F.3d at 73-74 (same), with DEK Energy Co. v. FERC, 248 F.3d 1192, 1196 (D.C. Cir. 2001) (no competitor standing where only "some vague probability" of increased competition and "a still lower probability" of injury stemming from that competition).  Put differently, to demonstrate a constitutionally sufficient competitive injury, a plaintiff must show that the challenged action has "the clear and immediate potential" to cause competitive harm. Associated Gas Distribs. v. FERC, 899 F.2d 1250, 1259 (D.C. Cir. 1990); see also New England Pub. Comm. Council, Inc. v. FCC, 334 F.3d 69, 74 (D.C. Cir. 2003).

In general terms, ATA maintains that the Bank's allegedly unlawful loan guarantees to foreign airlines have injured its members in the past and that the 2011 Commitments will cause additional and imminent injury.  More specifically, Plaintiffs contend that the Bank's acts have had – and, with respect to the 2011 Commitments, will imminently have – the effects of permitting foreign airlines to borrow at cheaper rates and operate at lower costs than domestic airlines and of increasing competition in the market for air travel on certain international routes. See generally Exhibits cited in ATA & Delta's Mot. at 14 and in ATA & Delta's Opp. & Reply at 8-9.  This increased competition, ATA further argues, will cut its members' profits, force them to abandon particular routes, or prevent them from initiating service on those routes, any of which would in turn cause economic loss and compel the airlines to eliminate jobs or refrain

from hiring.  To support these contentions, Plaintiffs have provided declarations from experts

and industry participants demonstrating both that previous guarantees made by the Ex-Im Bank

to Air India and other foreign airlines have injured Delta and ATA's other members, see

generally, e.g., ATA & Delta's Am. Compl., Exh. B (Decl. of Richard Anderson), and that the

2011 Commitments to Air India in particular will cause imminent competitive injury. See, e.g.,

id., Exh. D (Decl. of Daniel Kasper) at D-5 to D-6.

Evidence submitted concerning the effects of prior Ex-Im guarantees includes

declarations by Delta's Chief Executive Officer and its Senior Vice President of

Finance/Treasurer, which explain how the Bank's financing of foreign airlines' aircraft

purchases allows foreign airlines to borrow at better terms than Delta and other domestic airlines

and gives foreign airlines access to a larger pool of credit than that available to ATA's members.

See Decl. of Richard Anderson, ¶¶ 15-24; see generally ATA & Delta's First Am. Compl., Exh.

C (Decl. of Paul Jacobson).  Plaintiffs also rely in particular on the declaration of Daniel Kasper,

an expert on "issues involving economics, finance, competition, and competition policy in the

aviation and aerospace industries," Kasper Decl. at D-1, who speaks generally to the important

role played by the Ex-Im Bank's guarantees in financing foreign airlines' purchases of aircraft.

See id. at D-4 to D-12.  In addition, Kasper explains that many of the foreign airlines' Bank-

financed aircraft have been deployed in direct competition with U.S. airlines, and he provides

estimates of the total losses to U.S. airlines attributable to financing extended by the Ex-Im Bank

to foreign airlines. See id. at D-6.

With respect to past guarantees made to Air India specifically, one declarant from Delta

states that Air India used Bank-financed aircraft to start a nonstop service between Mumbai and

New York that directly competed with Delta's pre-existing service.  See Anderson Decl., ¶¶ 25-

32. Because of the resulting increased capacity on that route, operating the New York-Mumbai service became cost-prohibitive, and Delta was forced to discontinue that service in October 2008. See id. at 30.

While Defendants are likely correct that all of the economic hardships faced by ATA's members in recent years cannot be laid at the feet of the Ex-Im Bank, see Defs.' Mot. & Opp. at 2-3, the evidence submitted by Plaintiffs decisively establishes what seems a matter of common sense: the loan guarantees provided by the Ex-Im Bank to foreign airlines, in the aggregate, have injured ATA's members. But Plaintiffs are not challenging the Bank's prior guarantees; instead, this suit is directed in particular at the 2011 Commitments to Air India. It is the sufficiency of Plaintiffs' showing of imminent injury with respect to those guarantees, accordingly, that Defendants primarily dispute. And while Plaintiffs' showing that prior Bank guarantees have injured ATA's members provides some support for their argument that this guarantee will imminently cause them injury, see Canadian Lumber Trade Alliance, 517 F.3d 1319, 1334 (Fed. Cir. 2008) ("rational to infer that . . . distribut[ion] of money to an entity that aims to take away market share from [the plaintiff] and has already been somewhat successful in that effort . . . is likely to inflict further economic injury on [the plaintiff]"), it does not get them all the way there. See City of Los Angeles v. Lyons, 461 U.S. 95, 103 (1983) ("[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy."). The Court must thus direct its attention to the injury that is directly attributable to the 2011 Air India Commitments.

Although no party has submitted anything to suggest that the 787s purchased by Air India with the help of the Bank's financing have yet been put in the air, Plaintiffs have proffered evidence that seeks to demonstrate that the 2011 Commitments "will result in substantial injury

to U.S. carriers." Kasper Decl. at D-5. While it is not clear precisely how the injury will manifest – *i.e.*, on which particular routes the subsidized planes will be put to use, or whether the increased competition will force ATA's members out of the market on those routes, prevent them from entering the market on those routes, or simply cut into their profitability – the Court finds that Delta and ATA's other member airlines "face a substantial enough probability [of injury] to deem the injury to them imminent." Sherley, 610 F.3d at 74. If the form of the injury remains speculative insomuch as Air India might deploy its new planes on any of several routes and ATA's members may respond to the increased competition in any number of ways, the fact of imminent injury is not. Cf. id. at 72 ("The form of that injury may vary; for example, a seller facing increased competition may lose sales to rivals, or be forced to lower its price or to expend more resources to achieve the same sales, all to the detriment of its bottom line.").

ATA need not show that the particular planes financed by the 2011 Commitments will be put to use on routes on which ATA's members currently compete in order to show a competitive injury. Irrespective of where the 787s are deployed, it appears beyond dispute that the addition of multiple 787s to Air India's fleet will "significantly lower Air India's overall cost structure, thus enabling the carrier to more aggressively price its non-stop and connecting services to the United States." Pls.' Opp. & Reply, Exh. A (Supp. Decl. of Daniel Kasper), ¶ 19; see also A.R. at 67 ("The operating costs and maintenance costs of the B787 are estimated to be 30% lower than those of comparable aircraft."). The "new aircraft," furthermore, "will free up other planes for the airline to expand service to North America" or on other non-stop or connecting routes where ATA's members compete with Air India for customers. See ATA & Delta's Am. Compl., Exh. E (Heimlich Decl.), ¶ 35.

That conferring such a benefit to one entity constitutes a constitutionally cognizable injury to that entity's competitors was confirmed by then-Judge Scalia in <u>Sea-Land Serv., Inc. v. Dole</u>, 723 F.2d 975 (D.C. Cir. 1983). In <u>Sea-Land</u>, the D.C. Circuit held that a shipping company had standing to challenge a subsidy provided to one of its competitors "because it operates vessels upon some of the trade routes on which the [subsidized competitor's] <u>nonsubsidized</u> operations <u>may</u> be conducted." <u>Id.</u> at 977-78 (emphases added). Because boats are fungible, the court specifically noted that plaintiff did not have to show that its competitor would use the government subsidies on the particular routes on which the two shipping companies competed in order to demonstrate injury. <u>See id.</u> at 978. Rather, the mere fact of the government's subsidy to the plaintiff's direct competitor was sufficient to confer standing. <u>See id.</u>; <u>see also</u> <u>Autolog Corp. v. Regan</u>, 731 F.2d 25, 30-31 (D.C. Cir. 1984) (finding injury even where plaintiff did not compete on particular route on which challenged agency action authorized increased competition). The Court conceives of and Defendants have identified no reason why planes of similar capacity and capability should not be considered as fungible as <u>Sea-Land</u>'s boats. <u>See Sea-Land</u>, 723 F.2d at 728. As a result, ATA need not show that the Bank-subsidized planes will be deployed on routes where ATA's members compete.

In any event, the new planes <u>are</u> very likely to compete directly with service provided by ATA's members. Indeed, Plaintiffs' expert and other industry participants have attested to their belief that at least some of the Bank-subsidized 787s are destined for U.S. routes. <u>See, e.g.</u>, Supp. Kasper Decl., ¶ 5 (concluding that it is "highly likely that Air India would deploy a substantial proportion of its 787 capacity on routes to and from the United States"); Anderson Decl., ¶ 32; Heimlich Decl., ¶ 35. Specifically, Kasper opines that the 2011 Commitments to Air India are "almost certain to result in Air India increasing capacity to the United States by well

over 1% of aggregate U.S. carrier capacity serving India." Kasper Decl. at D-5 to D-6. This increased capacity, he further explains, will cause significant economic losses to domestic airlines. See id., ¶¶ 19-20; cf. Panhandle Producers and Royalty Owners Assoc. v. Economic Reg. Admin., 822 F.2d 1105, 1108 (D.C. Cir. 1987) ("Under undisputed economic principles, . . . an increase in supply is likely to depress . . . prices."). Although the Court does not necessarily credit the precise calculations Kasper proffers, his testimony that at least some of the new aircraft are substantially likely to be used on U.S. routes appears reasonable and is consistent with the statements of Plaintiffs' other declarants. See, e.g., Anderson Decl., ¶ 32; Heimlich Decl., ¶ 35.

These losses, as another declaration makes clear, will accrue not merely to U.S. carriers generally, but to ATA's members specifically. See Heimlich Decl., ¶¶ 30-35. Even putting aside the fact that two of ATA's members that have declined to join this lawsuit currently compete directly with Air India's existing nonstop United States-India service, see id., ¶¶ 31-33, additional competition on U.S.-India routes will make it more difficult (or perhaps impossible) for ATA's other members to expand their offerings in that market. Indeed, Delta officials have stated not only that previous loan guarantees to Air India forced Delta to terminate its non-stop service between the United States and India, but also that the 2011 Commitments will "foreclose[ ] [Delta] from that nonstop market for the foreseeable future." Anderson Decl., ¶ 32. Should Air India deploy its new aircraft on routes between the United States and India, Anderson avers, it will become "economically impossible for Delta to reenter and compete." Id. Consistent with the D.C. Circuit's decision in U.S. Telecom Ass'n v. FCC, 295 F.3d 1326 (D.C. Cir. 2002), evidence that a government action will prevent a plaintiff from entering a market and competing there can suffice to demonstrate competitive injury. See id. at 1331 (subsidy that foreclosed would-be competitor from entering market "on an equal basis" sufficient for injury).

Even if Air India does not use the Bank-subsidized planes on U.S. routes, furthermore, Plaintiffs have provided evidence that ATA's members will nevertheless face increased direct competition on other international routes.  See Supp. Kasper Decl., ¶¶ 6-16.  At least some of the new 787s, which are "widebody aircraft" particularly suitable for "long-haul routes," Kasper Decl., ¶ 28, will likely be put to use on international routes originating in either New Delhi, Air India's primary hub, or Mumbai, India's business center.  See Supp. Kasper Decl., ¶ 8 & n.9.  Because Air India currently offers nonstop service between the United States and those cities, any nonstop service provided from those cities to another international destination will result in a new one-stop service between the United States and that destination.  See id., ¶ 9.  "For example, because Air India already offers non-stop service from Delhi to both New York City and Bangkok, it is also able to offer connecting service for passengers wanting to travel between New York City and Bangkok."  Id. (emphasis in original).  If Air India deploys its new planes on non-U.S. routes, the resulting connecting service  will compete with connecting service provided by ATA's members.  Kasper's supplemental declaration explains in more detail how Air India's use of the Bank-subsidized planes on various international routes will compete with service provided by ATA's members.  See id., ¶¶ 6-16.  And although Defendants challenge Kasper's estimates in various respects, it is clear that the new planes will cause a non-trivial increase in competition on international routes served by ATA's members.

ATA has thus not only demonstrated that its members will be competitively injured by the 2011 Commitments regardless of whether the new planes are put to use on routes on which its members compete directly, but it has also shown that additional direct competition on international routes is substantially certain.  Acknowledging the "gulf between . . . the 'imminent' injury that suffices and the merely 'conjectural' one that does not," DEK Energy, 248

F.3d at 1195, the Court thus finds that ATA has made a factual showing sufficient to establish that it faces imminent competitive injury.  There is more than a "vague probability" that the subsidized planes will compete on routes served by ATA's members and an even more significant probability that said competition "will cause [those members] to lose business or drop its prices."  DEK Energy, 248 F.3d at 1196 (rejecting competitor standing where only "vague probability" of competition and "a still lower probability" of injury stemming from that competition).  Irrespective of where Air India deploys its planes, the Bank's guarantees "'will almost surely' cause [ATA's members] 'to lose business,' . . . or to cut prices in order to preserve business."  Id. (quoting El Paso Natural Gas Co. v. FERC, 50 F.3d 23, 27 (D.C. Cir. 1995)).

Defendants make three primary counterarguments that merit mention.  First, they suggest that the Court's previous Opinion in this case, which denied Plaintiffs' Motion for Preliminary Injunction on the ground that they had not demonstrated irreparable harm, see ATA, 2012 WL 119557, at *1, found or implied that Plaintiffs had not shown an injury in fact.  In that decision, however, the Court concluded only that Plaintiffs had not shown that they would be irreparably harmed by the one or two planes that might be delivered in the months while this suit was pending.  See id. at *9.  The irreparable-harm standard requires a more significant showing than the injury-in-fact standard.  See, e.g., In re Navy Chaplaincy, 534 F.3d 756, 766 (D.C. Cir. 2008) ("[T]o show irreparable harm, '[a] plaintiff must do more than merely allege . . . harm sufficient to establish standing.'") (quoting Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity, 950 F.2d 1401, 1410 (9th Cir. 1991)) (alteration in original).  The Court's conclusion that there would be no irreparable harm, accordingly, does not entail a lack of injury in fact.  The harm likely to ensue from the delivery of all of the planes provided for in the 2011

Commitments, furthermore, is much more significant than what can be attributed to the delivery of just one or two planes – all that the Court considered at the preliminary-injunction stage.

Second, Defendants suggest that competitor standing has been limited to cases in which the challenged action permitted "competitors to enter a market from which they previously had been excluded." See Defs.' Mot. & Opp. at 18.  Because this case involves increased competition from existing competitors – as opposed to new competition from new competitors – Defendants argue that Plaintiffs cannot look to competitive-injury doctrine to show injury.  See id.  While the "new competitor" fact pattern has undoubtedly been a common one in competitor-standing cases, Defendants point to nothing in those cases suggesting that the only kind of competitive injury sufficient to constitute injury in fact is that caused by the entry of a new competitor.  Indeed, in Shays v. FEC, 414 F.3d 76 (D.C. Cir. 2005), which addressed whether political candidates suffered injury in fact when FEC regulations permitted their rivals to engage in campaign practices that the plaintiffs contended were unlawful, see id. at 82, our Court of Appeals rejected precisely this argument.  Recognizing that "the challenged rules create[d] neither more nor different rival candidates – the electoral analogue to participants in a market," the court nevertheless found that "intensified competition" caused a constitutionally cognizable injury.  Id. at 86 (emphasis in original).  "Given that accounting for additional rivals constitutes injury in fact," the court reasoned, the "need to account for additional practices – and thus . . . additional campaign activity . . . – likewise supports Article III standing."  Id. (emphases in original).  "[B]oth [of] these changes – additional competitors and additional tactics – fundamentally alter the environment in which rival parties defend their concrete interests (e.g., their interest in persuading regulators, retaining customers, or winning reelection)."  Id.  In other words, regardless of whether the increased competition comes from a new competitor's entrance

into the market or from "intensified competition" from existing competitors, the injury – additional competition and the losses inhering therein – is effectively the same.

In addition, while Shays is perhaps the most direct and certainly the most in-depth rejection of Defendants' argument that only new entries into a market can cause a cognizable competitive injury, it is not the only time the D.C. Circuit has suggested that increased competition from existing competitors suffices.  Of particular relevance here, the Court of Appeals has expressly acknowledged that "regulatory decisions that permit subsidization of some participants in a market can have the requisite injurious impact on those participants' competitors."  U.S. Telecom, 295 F.3d at 1331 (citing Exxon Co., U.S.A. v. FERC, 182 F.3d 30, 43 (D.C. Cir. 1999); Liquid Carbonic Indus. Corp. v. FERC, 29 F.3d 697, 701 (D.C. Cir. 1994)). In several other cases, furthermore, courts have suggested that increased competition in forms other than new competitors serves as injury in fact.  See, e.g., La. Energy, 141 F.3d at 367 ("We repeatedly have held that parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition.") (emphasis added); Associated Gas Distribs. v. FERC, 899 F.2d 1250, 1259 (D.C. Cir. 1990) sufficient injury where "challenged action authorizes allegedly illegal transactions that have the clear and immediate potential to compete with the petitioners' own sales"); Panhandle Prods., 822 F.2d 1108 (competitors injured by agency order permitting increase in gas supply because "such an increase in supply is likely to depress the prices that [competitors] can secure").

Defendants' attempts to distinguish Shays and these other cases fall short.  First, Defendants contend that the outcome in Shays turned on the fact that the plaintiff-candidates "operated in a competitive environment entirely structured by agency rules."  Defs.' Reply at 3. In Sherley v. Sebelius, however, the Court of Appeals expressly rejected the "suggestion that

only a 'participant [ ] in [a] strictly regulated economic market[ ]' may assert competitor

standing." 610 F.3d at 72 (quoting <u>Sherley v. Sebelius</u>, 686 F. Supp. 2d 1, 7 (D.D.C. 2009))

(first alteration added).  Second, Defendants maintain that a competitive injury is only

cognizable where the plaintiff itself competed for the benefit conferred upon its competitor.  <u>See</u>

Defs.' Reply at 4.  Because ATA's members do not compete with Air India for loan guarantees,

the Government argues, they cannot claim competitor standing.  <u>See id.</u>  In support of this

contention, Defendants cite <u>Gottlieb v. FEC</u>, 143 F.3d 618 (D.C. Cir. 1998), a campaign-finance

case distinguished by <u>Shays</u> that provided that the plaintiff, a political action committee, could

not "claim standing as a 'competitor' of the Clinton campaign because it was never in a position

to receive [the] matching funds [at issue in the case] itself." <u>Id.</u> at 621.  "Only another

candidate," the court stated, "could make such a claim." <u>Id.</u>

 While this language in <u>Gottlieb</u> admittedly suggests otherwise, other cases make clear

that competitor standing is not limited to those instances where the plaintiff was competing for

the governmental benefit in question.  <u>See, e.g.</u>, <u>U.S. Telecom.</u>, 295 F.3d at 1331 (sufficient for

standing that plaintiff's "members are ready, willing, and able to compete" in a given market and

that government "subsidy prevents them from doing so on an equal basis").  Indeed, they make

clear that competitor standing need not involve a government benefit at all.  For example,

"competitors of financial institutions have standing to challenge agency action relaxing statutory

restrictions on the activities of those institutions." <u>Nat'l Credit Union Admin.</u>, 522 U.S. at 488;

<u>see also</u> <u>La. Energy</u>, 141 F.3d at 367 ("We have repeatedly held that parties suffer constitutional

injury in fact when agencies lift regulatory restrictions on their competitors . . . .");  <u>Shays</u>, 414

F.3d at 93 ("FERC litigants may challenge administrative procedures that could benefit rivals . . .

."). The logic of the competitor-standing doctrine, moreover, is that a plaintiff is injured by

increased competition, not by having been denied a benefit.  See Canadian Lumber, 517 F.3d at 1334 ("[I]n most 'competitor standing' cases, . . . it is presumed . . . that a boon to some market participants is a detriment to their competitors.") (emphasis in original).  Having been denied a governmental benefit may well be a distinct injury; it is not, however, a prerequisite for competitor standing.

Gottlieb's suggestion that only another candidate – and not a political action committee – could have competitor standing to challenge a campaign-financing scheme, accordingly, might best be read to stand for the proposition that only a direct competitor has standing to challenge a benefit conferred upon a rival.  ATA's member airlines, which compete directly with Air India, certainly fit this bill.  While Gottlieb may thus cast doubt on whether other members of the air-travel industry who are not direct competitors with Air India – for example, the airlines' employees, air traffic controllers, etc. – would have standing, the Court does not read it to require a plaintiff to have itself competed for a governmental benefit in order to challenge its conferral on a rival.

Finally, Defendants argue that if competitive harms such as those demonstrated by ATA's members constituted a constitutionally cognizable injury, every entity in the airline industry would have a viable claim to standing based on sheer speculation.  See Defs.' Mot. & Opp. at 17.  This is far from the truth.  ATA's members – unlike most other entities in the airline industry – are direct competitors with Air India, an entity upon whom the government has conferred a significant benefit.  See U.S. Telecom, 295 F.3d at 1331 ("[R]egulatory decisions that permit subsidization of some participants in a market can have the requisite injurious impact on those participants' competitors."); see also Canadian Lumber, 517 F.3d at 1334.  They have made a factual showing, moreover, that prior Bank guarantees caused them significant, concrete

injuries and that the 2011 Commitments are substantially certain to cause them further injury.

Plaintiffs are not uninterested members of the public seeking to interfere in an agency decision in

which they have no particularized interest; they are, instead, direct competitors who have made a

clear showing of injury.  Defendants' contention that finding injury here would create a slippery

slope by which anyone could challenge the Bank's decisions, accordingly, is overblown.

b.  Causation

Having cleared the injury-in-fact hurdle, things become substantially simpler for ATA.

While Defendants are undoubtedly correct that the Bank's allegedly unlawful financing practices

are not solely responsible for the financial woes of ATA's members, see Defs.' Mot. & Opp. at

23-21, that argument – which, it seems, is the only leg on which Defendants purport to stand

with respect to causation – does not undermine Plaintiffs' position.  After all, ATA need not

show that all the economic losses of its members are attributable to the Ex-Im Bank's actions; it

need only show that the imminent competitive injuries just discussed are "fairly traceable"

thereto.  Summers, 555 U.S. at 493.  Just as the Sea-Land court seemed to have little trouble

concluding that the subsidization of its rival caused that plaintiff's competitive injury, see 723

F.2d at 978, so too does the Court here conclude that the Bank's commitments caused the

airlines' competitive injury.  See also Shays, 414 F.3d at 93 (characterizing plaintiffs' causation

theory as "unremarkable" and emphasizing that "by tolerating what the law condemned, the

government caused plaintiffs' injury").

c.  Redressability

Redressability similarly poses few problems for Plaintiffs.  "[A] person who has been

accorded a procedural right to protect his concrete interests can assert that right without meeting

all the normal standards for redressability and immediacy."  Lujan, 504 U.S. at 572 n.7.  More

specifically, where an agency has allegedly failed to comply with a procedural requirement that was intended to protect a plaintiff's interests, that plaintiff "need not show that better procedures would have led to a different substantive result" in order to establish redressability.  Renal Physicians Ass'n v. U.S. Dept. of Health and Human Servs., 489 F.3d 1267, 1278 (D.C. Cir. 2007); see also Sugar Cane Growers Co-op. v. Veneman, 289 F.3d 89, 94-95 (D.C. Cir. 2002). Instead, it need only show that a court order requiring the agency to follow the procedures at issue would result in "a significant increase in the likelihood that [they] would obtain relief that directly redresses the injury suffered."  Utah v. Evans, 536 U.S. 452, 464 (2002).

This procedural-injury standard benefits Plaintiffs here.  The provisions of the Bank Act Plaintiffs seek to enforce set forth procedural requirements explicitly intended to protect the concrete interests of domestic industry participants like ATA's members.  See, e.g., 12 U.S.C. § 635a-2 ("The Bank shall implement such regulations and procedures as may be appropriate to insure that full consideration is given to the extent to which any loan or financial guarantee is likely to have an adverse effect on industries . . . and employment in the United States."); id. § 635(b)(1)(B) ("In authorizing any loan or guarantee, the Board of Directors shall take into account any serious adverse effect of such loan or guarantee on the competitive position of United States industry . . . .").  Because, as domestic industry participants, ATA's members are among the intended beneficiaries of these procedural requirements, Plaintiffs need not demonstrate that the Ex-Im Bank would have declined to issue the guarantees had it followed those procedures.  See Sugar Cane Growers, 289 F.3d at 94-95 ("A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered."); Renal Physicians, 489 F.3d at 1278.  Rather, they need only show that an order requiring the Bank to reconsider its

guarantee consistent with the procedural requirements it allegedly neglected would

"significant[ly] increase . . . the likelihood that [they] would" do so.  <u>Evans</u>, 536 U.S. at 464.

Assuming Plaintiffs succeed in showing that the Bank failed to consider the potential

"adverse effects" of the 2011 Commitments on domestic industry as §§ 635(b)(1)(B) and 635a-2

mandate, an order requiring it to do so would significantly increase the likelihood that the Bank

would decide not to guarantee Air India's loans.  Such a decision, moreover, would redress the

competitive injury caused by its prior contrary determination.  Given the relaxed redressability

standard applicable to claims of procedural right, that is all that is required.  <u>See</u> <u>Shays</u>, 414 F.3d

at 93.

Defendants nevertheless argue that a favorable decision for Plaintiffs would not redress

their injury because such a decision would not necessarily remove the competing planes from the

market.  <u>See</u> Defs.' Mot. at 25-26, Defs.' Reply at 10-11.  Indeed, although the Bank itself

concluded that Air India would have had difficulty obtaining alternative financing for these

aircraft, <u>see</u> A.R. at 41-42; <u>see also</u> Anderson Decl., ¶¶ 19, 31-32 ("Air India could not afford to

finance 30 additional widebody aircraft without support from the Bank."), it is certainly possible

that the airline could ultimately obtain other sources of funding for at least some of the 787s

covered by the 2011 Commitments.  <u>See</u> Def.'s Mot. & Opp., Exh. H (Decl. of Robert Morin), ¶

54 (identifying a "sale-leaseback arrangement" as a potential alternative financing option).  And,

more generally, Defendants are undoubtedly correct that "[i]t is inevitable that there will be

competition from foreign airlines flying widebody aircraft on the same international routes as

domestic carriers."  Def.'s Mot. & Opp. at 26.

That a court order would not remove all competition from foreign airlines generally and

Air India specifically, however, does not demonstrate that it would not redress the particular

competitive injury caused by the 2011 Commitments.  The Commitments have allowed Air India

to buy their planes from Boeing; without the Bank's backing, there is no clear indication they

could have obtained the full fleet sought.  The competitive injury about which Plaintiffs

complain would thus be redressed should the Bank, at the Court's order, follow its procedures

and decide not to approve the guarantees.  A favorable decision on the merits, consequently,

would redress Plaintiffs' injuries.

> ### 2. *Prudential Standing*

Having concluded that ATA's members would have constitutional standing to bring these

claims, only the judicially devised prudential-standing test remains.  To satisfy that test, ATA

must demonstrate that the interests this suit seeks to vindicate are "arguably within the zone of

interests to be protected or regulated by the statute or constitutional guarantee in question."  See

Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970).  The "zone of

interests" test "is not meant to be especially demanding," and, "in particular, there need be no

indication of congressional purpose to benefit the would-be plaintiff."  Clarke, 479 U.S. at 399-

400 (citing Inv. Co. Instit. v. Camp, 401 U.S. 617 (1971)).  Where "the plaintiff is not itself the

subject of the contested regulatory action," however, "the test denies a right of review if the

plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the

statute that it cannot reasonably be assumed that Congress intended to permit the suit."  Id. at

399.

ATA's members easily clear this low bar.  As the Court has already explained at length,

multiple provisions of the Bank Act convey Congress's intent to protect the competitive interests

of domestic industry participants, like ATA's members.  See, e.g., 12 U.S.C. §§ 635(b)(1)(A)-

(B), 635a-2.  As a result, those interests are not just "arguably within the zone of interests meant

to be protected by the Act," <u>Clarke</u>, 479 U.S. 400 (emphasis added), they are clearly within that zone.

B.  AVAILABILITY OF JUDICIAL REVIEW

While Plaintiffs have established standing to bring their claims and, concomitantly, the Court's jurisdiction to decide them, Defendants argue that those claims are nonetheless rendered nonjusticiable by § 701 of the APA.  The Supreme Court has long held that there is a "strong presumption that Congress intends judicial review of administrative action."  <u>Bowen v. Michigan Acad. of Family Physicians</u>, 476 U.S. 667, 670 (1986).  That presumption is embodied by the APA, which provides for judicial review of "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, so long as such review is not precluded by other statutes or "committed to agency discretion by law."  <u>See id.</u> §§ 701(a)(1)-(2); <u>see Sackett v. EPA</u>, 132 S. Ct. 1367, 1373 (2012) ( "The APA . . . creates a 'presumption favoring judicial review of administrative action . . . .'") (quoting <u>Block v. Cmty. Nutrition Instit.</u>, 467 U.S. 340, 345 (1984)).  Although Defendants concede that the Bank Act does not foreclose all potential challenges to the actions of the Ex-Im Bank, they argue that the Bank's decisions to issue loan guarantees are "committed to agency discretion" and are thus beyond the Court's reach.  <u>See</u> Defs.' Mot. & Opp. at 28-33; Defs.' Reply at 11-13.

The Supreme Court has held that the "committed to agency discretion" exception is "very narrow" and shields agency decisions from judicial review only in "rare instances."  <u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 410 (1971) (internal quotation marks and citations omitted), <u>abrogated on other grounds by Califano v. Sanders</u>, 430 U.S. 99, 105 (1977).  Specifically, the exception applies where "statutes are drawn in such broad terms that in a given

case there is no law to apply," id., or "no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985); see also Sierra Club v. Jackson, 648 F.3d 848, 855 (D.C. Cir. 2011).  If a matter is "committed to agency discretion," the Court must dismiss any challenge thereto under Rule 12(b)(6) for failure to state a claim.  See Jackson, 648 F.3d at 853-54 (holding that applicability of the "committed to agency discretion" exception is not jurisdictional question to be decided under Rule 12(b)(1), but rather is properly analyzed under Rule 12(b)(6) for failure to state a claim).

    To determine whether a matter has been committed to agency discretion, the Court must "'consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action.'" Sec'y of Labor v. Twentymile Coal Co., 456 F.3d 151, 156 (D.C. Cir. 2006) (quoting Drake v. FAA, 291 F.3d 59, 70 (D.C. Cir. 2002)).  In this case, however, these two considerations seem to pull in opposite directions.  As Defendants point out, the nature of the administrative action at issue – the decision to issue a loan guarantee – tends to suggest that the agency's discretion should govern: "Loan applicants depend on the Bank's speed and reliability, both of which would be greatly impaired if every loan decision were subject to APA review."  Defs.' Mot. & Opp. at 33. Although loan-guarantee determinations are by no means on a level with decisions not to take enforcement action, which are and have historically been presumptively unreviewable, see, e.g., Heckler, 470 U.S. at 821-22, there is certainly reason to think such decisions might best be left to the Bank's good judgment.  See Helgeson v. Bureau of Indian Affairs, 153 F.3d 1000, 1004 (9th Cir. 1998) ("[T]he question of whether, and in what amount, a government loan should be afforded is an area of executive action usually reserved to agency discretion . . . ."); but see Getty

v. Fed. Sav. and Loan Ins. Corp., 805 F.2d 1050, 1058 (D.C. Cir. 1986) (holding lending

agency's assessment of financing terms was not "committed to agency discretion").

      While the nature of the relevant action perhaps weighs in favor of nonjusticiability, the

language and structure of the Bank Act suggest otherwise.  It is the statute, moreover, that

governs.  See Lincoln v. Virgil, 508 U.S. 182, 193 (1993) ("Congress may always circumscribe

agency discretion . . . by putting restrictions in the operative statutes . . . ."); Heckler, 470 U.S. at

832-33 (even with respect to decisions not to enforce, which are presumed unreviewable,

"presumption may be rebutted where the substantive statute has provided guidelines for the

agency to follow in exercising its enforcement powers") (Marshall, J., concurring).  The

provisions of the Bank Act Plaintiffs seek to enforce evince a clear congressional intent to

protect the interests of domestic industry and domestic employees.  See, e.g., 12 U.S.C.

§635(a)(1) ("The Bank's objective in authorizing . . . guarantees . . . shall be to contribute to

maintaining or increasing employment of United States workers.").  This goal provides the

agency with a regulatory polestar and affords the Court a mark by which to evaluate its

determinations.  See Robbins v. Reagan, 780 F.2d 37, 45 (D.C. Cir. 1985) ("Even when there are

no clear statutory guidelines, courts often are still able to discern from the statutory scheme a

congressional intention to pursue a general goal.").

      In more than one instance, moreover, the statute uses mandatory language in imposing

upon the Bank specific responsibilities with respect to domestic interests.  See, e.g., 12 U.S.C. §

635(b)(1)(B) ("Board of Directors shall take into account" effects on U.S. industry), 635(e)(1)

("Bank may not extend . . . guarantee" if it determines competition with and injury to domestic

industry will result), 635a-2 ("Bank shall implement such regulations and procedures as may be

appropriate to insure that full consideration is given to" likely effects on U.S. industry and

employment) (all emphases added).  The use of such language "is evidence that Congress intended that the statute be subject to judicial review."  Beverly Health & Rehab. Servs., Inc. v. Thompson, 223 F. Supp. 2d 73, 90 (D.D.C. 2002); see also Cody v. Cox, 509 F.3d 606, 608, 610-11 (D.C. Cir. 2007).  In some respects, at least, these requirements comprise clear and specific law for the Court to apply.  Whether the Bank did or did not consider "adverse effects" on domestic industry as required by §§ 635(b)(1)(B) and 635a-2 or whether it did or did not comply with the notice-and-comment procedures outlined in § 635(e)(7), for example, are patently justiciable questions.

That the Bank Act provides the Court with sufficient guidance in determining whether the Bank has conformed to the statute's requirements does not mean, admittedly, that every aspect of the loan-guarantee determination is justiciable.  Indeed, the Bank Act undoubtedly endows the Bank with significant discretion concerning the balancing of multiple factors in making loan-guarantee determinations.  "The mere fact that a statute grants broad discretion to an agency," however, "does not render the agency's decision completely nonreviewable . . . ."  Robbins, 780 F.2d at 45.  Although the statute provides the Court with no guidance in determining the weight the Bank must afford each factor involved in loan-guarantee decisions, it does impose particular mandatory requirements that the Court can enforce.  See, e.g., State Farm, 463 U.S. at 43 (agency's action arbitrary and capricious where factor Congress required agency to consider was ignored); Pub. Citizen v. Fed. Motor Carrier Safety Admin., 374 F.3d 1209, 1216 (D.C. Cir. 2004) ("When Congress says a factor is mandatory, that expresses its judgment that such a factor is important," and "an agency's rule normally is arbitrary and capricious if it 'entirely failed to consider an important aspect of the problem' before it.") (quoting State Farm, 463 U.S. at 43); United Mine Workers v. Dole, 870 F.2d 662, 673 (D.C. Cir. 1989) (agency

defies a "statutory limitation on [its] authority" when it ignores mandatory factor).  The Bank

Act makes clear that in weighing the multiple factors involved in making loan-guarantee

decisions, the Ex-Im Bank must take specific steps to ensure that the interests of domestic

industry are, at the very least, placed on the scale.  See Strycker's Bay Neighborhood Council,

Inc. v. Karlen, 444 U.S. 223, 227 (1980) (where statute requires agency to "consider" particular

factors, court's "only role . . . is to insure that the agency has considered [those factors]").

Where, as here, a plaintiff seeks to ensure compliance with those specific requirements, it has

sufficinetly stated a claim under the APA such that 12(b)(6) dismissal is inappropriate.

    The Court does not lightly conclude that a provision of a statute that has never previously

been enforced by a court is judicially enforceable.  But simply because no one has brought a

particular kind of case in the past does not mean that such suits are verboten.  That the scope of

its review is limited to ensuring compliance with the statute's specific mandates, moreover,

reassures the Court that its decision here will not unduly inject the judiciary into the Bank's

delicate decisionmaking process.  While "[e]xtremely narrow review is not . . . conceptually

equivalent to . . . no review at all," such limited review "may often turn out in practical effect" to

be almost no better.  Marshall Cnty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1225 (D.C.

Cir. 1993).

    C.  MERITS

    Having found that Plaintiffs have standing and that the Bank's loan-guarantee decisions

are not entirely committed to agency discretion, the Court (at last) turns to Plaintiffs' claims.  In

a nutshell, Plaintiffs allege that the Ex-Im Bank's decision to make the 2011 Commitments to

Air India was arbitrary, capricious, or otherwise contrary to law in violation of the APA.  More

specifically, they argue that the 2011 Commitments violated the Bank Act – and, by extension,

the APA – in three ways.  First, Plaintiffs contend that the Bank violated 12 U.S.C. §§ 635(b)(1)(B) and 635a-2 by failing to consider the potential "adverse effects" of the Commitments on the domestic airline industry and employment.  Second, they allege that the Bank issued the Commitments in violation of § 635(e)(1), which prohibits the issuance of loan guarantees "for establishing or expanding production of any commodity for export . . . if the Bank determines that . . . the extension of such . . . guarantee will cause substantial injury to United States producers of the same, similar, or competing commodity."  Id.  Third, they argue that the Bank violated § 635(e)(7) by neglecting to subject the 2011 Commitments to a "detailed economic impact analysis" and failing to follow the notice-and-comment procedures that must accompany such analyses.  The Court will consider each of these issues in turn, ultimately concluding that the Ex-Im Bank complied with the Bank Act's requirements and, as a result, that the 2011 Commitments were neither arbitrary and capricious nor contrary to law.

　　　　1.　*§§ 635(b)(1)(B) and 635a-2*

　　Plaintiffs maintain that the Bank violated the Bank Act when it failed to consider the "adverse effects" of the Air India guarantees on domestic airlines and their employees.  Such consideration, they argue, is mandated by two related provisions of the Bank Act, 12 U.S.C. §§ 635(b)(1)(B) and 635a-2.  In relevant part, § 635(b)(1)(B) provides:

> [I]n authorizing any loan or guarantee, the Board of Directors shall take into account any serious adverse effect of such loan or guarantee on the competitive position of United States industry . . . and employment in the United States, and shall give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports.

The pertinent section of § 635a-2, similarly, states:

> The Bank shall implement such regulations and procedures as may be appropriate to insure that full consideration is given to the

> extent to which any loan or financial guarantee is likely to have an
> adverse effect on industries . . . and employment in the United
> States, either by reducing demand for goods produced in the
> United States or by increasing imports to the United States.

While these portions of the statute utilize somewhat different language, both sides appear to agree that their import is the same: the Bank is required to consider the adverse effects of its loan guarantees on domestic industry and employment.  See ATA & Delta's Mot. at 13-14; Defs.' Mot. & Opp. at 36-38.  Plaintiffs maintain that the Bank violated both provisions by neglecting to consider the potential impact of the 2011 Commitments on U.S. airlines and their employees.  See ATA & Delta's Mot. at 13-15.  Such failure, they contend, rendered the agency's decision arbitrary and capricious.  See, e.g., Overton Park, 401 U.S. at 416-17 (agency acted arbitrarily and capriciously because decision was not "based on a consideration of the relevant factors," and it failed to "follow[ ] the necessary procedural requirements"); United Mine Workers, 870 F.2d at 674 (agency acted arbitrarily and capriciously due to "complete absence of any discussion" of statutorily required element).

Defendants seem to concede that no consideration of the adverse effects of the 2011 Commitments on domestic industry took place within the confines of the Administrative Record submitted to the Court.  See Defs.' Mot. & Opp. at 35-47.  Instead, they argue that the statutorily required consideration took place when the Bank established its EIPs and applied them to the 2011 Commitments.  See id.  The first question for the Court, then, is whether it may consider the EIPs, despite their absence from the Administrative Record, in determining if the Bank satisfied its statutory obligations.  Concluding that it may, the Court must then decide whether the institution and application of the EIPs sufficed to discharge the Bank's obligations under §§ 635(b)(1)(B) and 635a-2.  In the end, the Court finds that the Bank's EIPs do satisfy the minimal obligation imposed by these provisions.

a.   Consideration of EIPs

On November 29, 2011, in response to an Order requiring Defendants to produce "the entirety of the administrative record relied upon by the [Bank]," Nov. 16, 2011, Order (ECF No. 4) at 2, the Bank filed the Administrative Record for its decision to issue the 2011 Commitments to Air India.  See generally Notice of Filing of Administrative Record (ECF No. 18).  That Record, which has been significantly redacted so as to protect Air India's business information, see id. at 1-7, generally consists of the Bank's evaluation of Air India's creditworthiness and of the aircraft's value as collateral.

Defendants do not appear to dispute Plaintiffs' allegation that nothing within the four corners of that record expressly indicates that the EIPs were applied to the Air India guarantees. See ATA & Delta's Mot. at 19-23.  They insist, however, that because the EIPs are the standard procedures followed with respect to every Bank transaction, the fact of their application is implicit in the Board's vote to approve the commitments and is, in fact, assumed in Plaintiffs' own pleadings.  See Defs.' Mot. & Opp. at 46.  In addition, the Bank has submitted a declaration prepared by agency official James Cruse that confirms what the record implies and Plaintiffs' themselves alleged: that the EIPs were in fact applied to the Air India Commitments.  See Defs.' Mot. & Opp., Exh. J (Second Decl. of James Cruse), ¶ 8.  Arguing that the Court's review should be limited to the Administrative Record, Plaintiffs contend that the Court may consider neither Cruse's confirmation that the EIPs were applied to the Air India transactions nor the EIPs themselves.  See ATA & Delta's Mot. at 19-23.

The Court, however, has little trouble concluding that it may adjudicate Plaintiffs' challenge to the EIPs by evaluating the EIPs themselves, their absence from the Administrative Record notwithstanding.  First, Plaintiffs' argument in their recent briefing that the Bank did not

apply the EIPs – and, as a result, that the Court may not rely on them in evaluating the agency's

decision – directly contradicts their own prior allegations.  Specifically, both Complaints

acknowledge that the EIPs are "the Ex-Im Bank's means for complying with [its] statutory

obligations" to consider the adverse effects of its guarantees and state that "all applications are

subject" to the EIPs.  See ATA & Delta's Am. Compl., ¶¶ 63-64 (emphasis added); ALPA's

Compl., ¶¶ 60-61 (emphasis added).  Plaintiffs quote directly from the EIPs, which are available

online, and even purport to challenge the content of those procedures directly.  See ATA &

Delta's Am. Compl., ¶ 66; ALPA's Compl., ¶ 63.  While it might have been preferable for the

Bank to have included the EIPs in the Administrative Record filed with the Court and for that

Record to more clearly reflect the fact that they were applied to the 2011 Commitments, it would

defy logic to permit Plaintiffs to base their claims on the Bank's application of its EIPs and then

argue that the EIPs are outside the scope of the Court's consideration.

     Second, the Court may consider Cruse's declaration to the extent that it merely confirms

that the usual procedures were followed, a historical fact implicit in the Administrative Record

and consistent with Plaintiffs' own allegations.  Although courts' review of agency action is

ordinarily limited to the administrative record, see, e.g., Florida Power & Light Co. v. Lorion,

470 U.S. 729, 743 (1985), "there is nothing improper in receiving declarations that 'merely

illuminate[ ] reasons obscured but implicit in the administrative record.'"  Clifford v. Pena, 77

F.3d 1414, 1418 (D.C. Cir. 1996) (quoting Clifford v. Pena, 891 F. Supp. 641, 647 (D.D.C.

1995)) (alteration in original).  The fact that EIPs were applied in the usual manner was

"obscured but implicit" in the Board's approval of the 2011 Commitments.  Id.  As Plaintiffs'

pleadings demonstrate, furthermore, both the content of the EIPs and the means by which they

are applied to foreign-airline transactions are "well known to the agency and the parties."  Id.

With respect to Cruse's verification of these limited facts, moreover, the justifications for the so-called "record rule" are simply not implicated.  Unlike the "*post hoc* rationalizations for agency action" that have been rejected by reviewing courts, Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962), both the EIPs themselves and the fact that they had been applied were "actually before the agency" at the time it made its decision.  Ass'n of Private Sector Colls. and Univs. v. Duncan, 681 F.3d 427, 441 (D.C. Cir. 2012); see also Overton Park, 401 U.S. at 240.  And because the EIPs are publicly available and Cruse's explanation of their application is consistent with Plaintiffs' own pleadings, Plaintiffs are by no means unfairly disadvantaged by the use of the Cruse declaration in this limited capacity.[2]  Insofar as other portions of the Cruse declaration or the other declarations submitted by the agency cross the line from permissible clarification to impermissible *post hoc* rationalization, the Court does not consider them.  See Envtl. Def. Fund, Inc. v. Costle, 657 F.2d 275, 284 (D.C. Cir. 1981).

The Court will look to the Cruse declaration, then, only to confirm that the EIPs were applied in the usual manner to the Air India transactions and for certain historical facts about the EIPs, see Part III.C.1.b.i, *infra*, but not for any discussion or analysis of the Bank's interpretations.  In addition, in the sections that follow it will look to the content of those EIPs to determine whether the Bank ran afoul of §§ 635(b)(1)(B) and 635a-2 when it approved the 2011 Commitments to Air India.

### b. EIPs and "Adverse Effects" Requirements

---

[2] Nor are Plaintiffs entitled to "take discovery of the Bank's declarants and its decisionmakers" under Rule 56(d).  See ATA & Delta's Opp. & Reply at 34.  The publicly available EIPs – which Plaintiffs quote directly in their Complaints, see ATA & Delta's Am. Compl., ¶ 65; ALPA's Compl., ¶ 62 – certainly do not constitute material "unavailable" to Plaintiffs.  See Fed. R. Civ. P. 56(d).  In addition, the Court is not relying on the Cruse declaration for anything beyond what Plaintiffs' themselves allege.  "Without some reason to question [Cruse's] veracity," Plaintiffs are not entitled to discovery to "test" his truthfulness.  Dunning v. Quander, 508 F.3d 8, 10 (D.C. Cir. 2007) (quoting Strang v. U.S. Arms Control & Disarmament Agency, 864 F.2d 859 (D.C. Cir. 1989)) (internal quotation marks omitted).

Having determined that it may consider the EIPs, the Court can now proceed to analyze them in the context of the Bank's statutory obligations.  Again, 12 U.S.C. §§ 635(b)(1)(B) and 635a-2 require the Bank to, respectively, "take into account any serious adverse effect of [its guarantees] on the competitive position of United States industry . . . and employment in the United States," 12 U.S.C. § 635(b)(1)(B), and "implement such regulations and procedures as may be appropriate to insure that full consideration is given to the extent to which any loan or financial guarantee is likely to have an adverse effect on industries . . . and employment in the United States."  Id. § 635a-2.  Defendants maintain that the application of their EIPs satisfies these "adverse effects" requirements.  See EIPs at 1 ("The purposes of Ex-Im Bank's [EIPs] are," inter alia, "to ensure that all transactions are screened for economic impact implications . . . .").  Of relevance here, the first stage of the EIPs exempts from additional economic-impact scrutiny those transactions that will not "result in the production of an exportable good."  Id. Because the Bank does not consider foreign-airline transactions to result in exportable goods, the adverse effects of such transactions are not subjected to any further analysis.  See Cruse Decl., ¶ 8; ATA & Delta's First Am. Compl., ¶¶ 64-66; ALPA's Compl., ¶¶ 61-63.  The use of the EIPs, the Bank believes, nevertheless satisfies its obligation to consider the "adverse effects" of its transactions.

Plaintiffs respond that it is arbitrary and capricious to exempt from further analysis all transactions that will not produce "exportable goods."  See ATA & Delta's Am. Compl., ¶¶ 64-66 (quoting EIPs at 1-2); ALPA's Compl., ¶¶ 61-63 (same).  The effect of such screens, Plaintiffs suggest, is that the Bank utterly fails to consider the "adverse effects" of those transactions and, in so doing, fails to comply with the obligations imposed by §§ 635(b)(1)(B) and 635a-2.  See ATA & Delta's Mot. at 25-26.  Alternatively, Plaintiffs challenge the Bank's

application of the "exportable good" screen to the 2011 Commitments, insisting that, contrary to

the Bank's position, foreign-airline transactions <u>do</u> result in the production of an "exportable

good": available daily seats.  <u>See id.</u> at 15-16, 26-27.  The Court will first consider the standard

of review that applies here.  Next, it will address Plaintiffs' challenge to the Bank's general use

of the "exportable good" screen.  Last, it will review their alternative argument concerning the

application of that screen to foreign-airline transactions.

i.    <em>"Exportable Good" Screen: Standard of Review</em>

In determining whether the Bank's decision to limit in-depth "adverse effects" analysis

only to those transactions that will result in the production of an "exportable good" is a

permissible construction of §§ 635(b)(1)(B) and 635a-2, the Court must first determine how

much deference is owed to the Agency's interpretation.  Somewhat surprisingly, both parties

appear to assume that <u>Chevron</u>'s familiar framework for evaluating an agency's interpretation of

a statute it administers should apply to the interpretation of §§ 635(b)(1)(B) and 635a-2 reflected

in the EIPs.  <u>See</u> ATA & Delta's Opp. & Reply at 37-41 (applying <u>Chevron, U.S.A., Inc. v.

Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984)); Defs.' Mot. at 35 (same).  <u>Chevron</u>'s

applicability, however, is not a given.  <u>See</u> <u>Fox v. Clinton</u>, --- F.3d ---, 2012 WL 2094410, at *10

(D.C. Cir. June 12, 2012) ("It is clear that 'not all statutory interpretations by agencies qualify for

[<u>Chevron</u>] deference.") (quoting <u>Pub. Citizen, Inc. v. U.S. Dep't of Health & Human Servs.</u>, 332

F.3d 654, 659 (D.C. Cir. 2003)) (alteration in original).

"Deference in accordance with <u>Chevron</u> . . . is warranted only 'when it appears that

Congress delegated authority to the agency generally to make rules carrying the force of law, and

that the agency interpretation claiming deference was promulgated in the exercise of that

authority.'"  <u>Gonzales v. Oregon</u>, 546 U.S. 243, 255-56 (2006) (quoting <u>United States v. Mead</u>

44

Corp., 533 U.S. 218, 226-27 (2001)).  The application of that standard to the EIPs, though, does

not yield a clear answer.  On the one hand, the Bank Act authorizes the Ex-Im Bank to

promulgate regulations and specifically instructs the Bank to "implement such regulations and

procedures as may be appropriate" to guarantee that it considers the adverse effects of its

guarantees on domestic industry and employment.  12 U.S.C. § 635a-2.  Congress thus left it to

the Bank to determine how "adverse effects" should be analyzed, and the EIPs represent the

considered judgment of the agency on matters within its area of expertise.  Cf. Barnhart v.

Walton, 535 U.S. 212, 222 (2002) (applying Chevron because of, inter alia, the "interstitial

nature of the legal question" and the "related expertise of the Agency").

On the other hand, the 2007 EIPs are not the product of "either a notice-and-comment

rulemaking or a formal adjudication, the usual suspects for Chevron deference."  California

Valley Miwok Tribe v. U.S., 515 F.3d 1262, 1266 (D.C. Cir. 2008); Menkes v. U.S. Dep't of

Homeland Sec., 637 F.3d 319, 345 (D.C. Cir. 2011) ("Nor does Chevron govern an agency

declaration unaccompanied by those procedural safeguards ensuring proper administrative

practice.").  While the lack of such formality does not itself foreclose the applicability of

Chevron, see id., it is also not entirely clear that the EIPs carry the force of law.  Indeed, one

might construe the EIPs as non-binding internal guidelines more akin to the "'interpretations

contained in policy statements, agency manuals, and enforcement guidelines'" that are "beyond

the Chevron pale," Mead, 533 U.S. at 234 (quoting Christensen v. Harris County, 529 U.S. 576,

587 (2000)), than to the kind of formal and binding regulations that are the usual objects of

Chevron deference.

Fortunately, however, the Court need not determine whether the EIPs merit Chevron

deference because "to hold that an agency decision 'do[es] not fall within Chevron is not . . . to

place [it] outside the pale of any deference whatever.'" <u>Fox</u>, 2012 WL 2094410, at *9 (quoting

<u>Mead</u>, 533 U.S. at 234) (alterations in original).  If an agency's interpretation of  its governing

statue is not entitled to the considerable deference afforded under <u>Chevron</u>, courts still give

credit to agency interpretations where such credit is due.  See <u>id.</u>  Specifically, consistent with

the Supreme Court's decision in <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944), "'[t]he weight

[accorded to an administrative judgment] in a particular case will depend upon the thoroughness

evident in its consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade, if lacking power to

control.'"  <u>Mead</u>, 533 U.S. at 228 (quoting <u>Skidmore</u>, 323 U.S. at 140) (second alteration in

<u>Mead</u>).

      Such considerations counsel in favor of lending significant weight to the interpretation of

§§ 635(b)(1)(B) and 635a-2 set forth in the EIPs.  Although they have been amended several

times, the Bank's EIPs have existed in some form since 1979 and thus represent the culmination

of multiple generations of Bank officials' expertise.  See Cruse Decl., Exh. 5 (January 5, 1979

Memorandum).  Indeed, the Bank has twice specifically considered the concerns of the domestic

airlines and found them unsubstantiated.  See <u>id.</u>, Exh. 10 ("Exim Aircraft Support and Its

Impact on US Airlines," June 20, 1984) at 12-14; <u>id.</u>, Exh. 11 ("Is the ASU Guarantee 'Too

Cheap'?," Aug. 2, 2011) at 2-3.  The particular practice of excluding from further analysis those

transactions that will not result in the production of an "exportable good," furthermore, is itself

hardly recent.  See Second Cruse Decl., Exh. 6 (Memorandum to the Board of Directors, Sept.

17, 2011) at 3 (proving that the "exportable good" screen dates back more than ten years).  And

most importantly, the question of how "adverse effects" on domestic industry and employment

should be identified and weighted is squarely within the category of inquiries the Ex-Im Bank's expertise puts it in the best position to answer.

Although Plaintiffs contend that the EIPs are not worthy of any deference because they have changed over time, see ATA & Delta's Mot. at 23-25; ATA & Delta's Opp. & Reply at 41-42, any such change does not strip the EIPs of the deference to which they would otherwise be entitled.  The only changes about which Plaintiffs complain are 1) the Bank's failure to provide notice of and opportunity for comment on its 2007 revisions to the EIPs despite having done so for two previous revisions and 2) the Bank's acknowledgement that one of the changes made in 2007 was made in an attempt to remedy an "inconsistency between [the Bank's] practice and [its] procedure[s]."  See ATA & Delta's Mot. at 24-25 (quoting Cruse Decl., Exh. 8 (Mem. to the Bd. of Directors, Apr. 4, 2007) at 1).  Because the Bank has failed to "supply a reasoned analysis indicating that prior policies and standards [were] being deliberately changed" in these two ways, Greater Boston Tel. Corp. v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970) (footnotes omitted), Plaintiffs contend that the EIPs are unworthy of deference and "arbitrary and capricious on their face."  ATA & Delta's Mot. at 23.

Neither alleged inconsistency undermines the EIPs' "power to persuade," Skidmore, 323 U.S. at 140, let alone renders them facially invalid.  With respect to the Bank's failure to follow the notice-and-comment procedures when it revised the EIPs in 2007, it is important to emphasize that the Bank was never required to use notice-and-comment in the first place.  See 12 U.S.C. §§ 635(e)(7)(F) ("subchapter II of chapter 5 of Title 5," which contains the APA's notice-and-comment requirements, not "applicable to the Bank"); id. § 635a-2 (similar); see also ATA & Delta's Mot. at 4 & n.2 (acknowledging as much).  The Bank's voluntary decisions to twice submit to more formal procedures than were required in amending its EIPs do not mean that it

must continue to do so for all time.  Indeed, to so hold would discourage agencies from permitting public participation where such participation was not mandated by statute.  And even if the Bank's two prior uses of notice-and-comment procedures could be considered a "policy" or "practice" from which the 2007 amendments diverged, Plaintiffs have not suggested that they were in any way "penalize[d] . . . for reasonable reliance on the prior practice."  Eastern Carolinas Broad. Co. v. FCC, 762 F.2d 95, 101 (D.C. Cir. 1985).

Nor have they explained how any change effected by the 2007 amendments affects the outcome of their dispute.  In particular, the Court does not see – and Plaintiffs do not suggest – how the small change to the "exportable good" screen prompted by the Bank's discovery of an "inconsistency between practice and procedure," Mem. to Bd. of Directors, Apr. 4, 2007, could have affected foreign-airline transactions.  The 2007 EIPs, moreover, are publicly available.  Any material change in policy caused by the 2007 amendments, accordingly, was by no stretch of the imagination a "*sub silentio*" departure from prior practice.  See FCC v. Fox Tel. Stations, Inc., 556 U.S. 502, 515 (2009).

The Court, therefore, will proceed to afford Skidmore deference to the interpretation of the Bank Act set forth in the EIPs.  Because it ultimately finds that the EIPs satisfy the consideration of "adverse effects" required by §§ 635(b)(1)(B) and 635a-2 even without Chevron deference, it need not decide whether such heightened deference is due.

### ii.  *Use of "Exportable Good" Screen*

Armed with a standard of review, the Court can proceed to the merits of the question: is the Bank's practice of exempting from further economic-impact analysis those transactions that will not "result in the production of an exportable good," EIP at 1, consistent with 12 U.S.C. §§ 635(b)(1)(B) and 635a-2?  As previously discussed, see Part III.C.1, *supra*, both parties seem to

agree that §§ 635(b)(1)(B) and 635a-2 should be read to impose a single obligation on the

agency.  See ATA & Delta's Mot. at 13-14; Defs.' Mot. & Opp. at 36-38.  Plaintiffs further do

not seem to dispute that that single obligation can be discharged by a single inquiry.  Indeed,

absent a contrary indication in the statute, the Bank's choice to utilize one set of procedures to

satisfy both provisions is certainly a reasonable one.  It is almost unthinkable that Congress

would have intended that the agency be so inefficient as to conduct two separate "adverse

effects" inquiries.  Cf. U.S. v. Andrews, 600 F.3d 1167, 1174 (9th Cir. 2010) ("[S]tatutes should

not be interpreted to require such inefficiency.").  So long as the EIPs satisfy both provisions, the

Bank Act gives no indication that a single inquiry cannot suffice.

    Plaintiffs go this far with the Bank and no farther.  In arguing that the EIPs fail to

provide for the statutorily required consideration of "adverse effects," they first assert that the

agency's use of the screens inappropriately rules out whole categories of transactions from

economic-impact scrutiny, which violates the statute's requirement that all transactions be

analyzed for potential "adverse effects."  Plaintiffs insist that this alone renders the EIPs

inconsistent with §§ 635(b)(1)(B) and 635a-2 and, accordingly, arbitrary and capricious.

Second, Plaintiffs contend that even if the Bank can rule out some transactions from fuller

economic-impact analysis, drawing the line at those transactions that will result in the production

of "exportable goods" is arbitrary and capricious.

    The Bank's decision to make categorical judgments about the kinds of transactions that

are likely to have adverse effects on domestic industry and to limit fuller analysis of adverse

effects to those kinds of transactions is entirely consistent with the statute.  In fact, multiple

provisions of the Bank Act contemplate such categorical decisionmaking.  For instance, § 635a-

2's directive that the agency "implement such regulations and procedures as may be appropriate

to insure . . . full consideration" of adverse effects, 12 U.S.C. § 635a-2 (emphasis added), indicates that the Bank was not merely permitted to develop a policy and make categorical decisions about "adverse effects," it was expected to do so.  Section 635(e)(7), which will be discussed in greater detail in Part III.C.3, *infra*, furthermore, provides that certain procedural requirements apply only "[i]f . . . the Bank conducts a detailed economic impact analysis."  Id. § 635(e)(7)(A) (emphasis added).  That language conveys Congress's expectation that such analyses would not be conducted in every case.  Why else the "if"?

It would be utterly impractical, furthermore, for the Bank to reconsider its judgment about the kinds of transactions that are likely to adversely affect domestic industry and employment each time it is presented with a new application.  "[E]ven if a statutory scheme requires individualized determinations," the Supreme Court has emphasized, an agency may "resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority."  Am. Hosp. Ass'n v. NLRB, 499 U.S. 606, 612 (1991).  This presumption confirms that, unless a statute provides otherwise, there is no need for an agency "continually to revisit issues that may be established fairly and efficiently" through the establishment of a general rule or procedure.  Lopez v. Davis, 531 U.S. 230, 244 (2001) (internal quotation omitted) (upholding Bureau of Prisons regulation that categorically excluded some offenders from its early-release program).  Given that the Bank receives thousands of applications each year, its decision to make some categorical judgments about the kinds of transactions that are "likely to have an adverse effect on industries . . . and employment in the United States," 12 U.S.C. § 635a-2, and to limit in-depth economic-impact analysis to only those transactions is a reasonable and efficient policy choice permitted by the statute.  See S. Rep. No. 99-274 at 8 (1986) ("[T]he Committee recognizes the need for [the Bank] to respond to

50

exporters' requests . . . in a timely and confidential fashion and intends that the Bank implement

its adverse economic impact analysis procedures in a practical and workable fashion.  The bill

does not require the Bank to conduct further analysis if it views its existing body of knowledge

as sufficient.").

The EIPs reflect and implement the Bank's categorical approach to the consideration of

"adverse effects."  By instituting a series of screens intended to identify those transactions most

likely to pose a significant risk of "adverse effects," the Bank "ensure[d] that all transactions are

screened for economic impact implications" while simultaneously reserving its limited resources

for "those cases that require further economic impact analysis through a more extensive

process."  EIPs at 1.  Plaintiffs' allegation that the screens serve to remove "transactions from

any consideration for any adverse impacts," ATA & Delta's Mot. at 28 (emphases in original),

entirely mischaracterizes their operation.  When the EIPs operate to exempt applications from

more in-depth analysis, that does not mean that the Bank did not consider the adverse effects of

those transactions.  Instead, by applying its EIPs, the "Bank reviews all transactions it receives

for potential economic impact."  EIPs at 1.  Both the initial decision that resulted in the

institution of the EIPs and their subsequent application to individual transactions constitute

consideration of "adverse effects."

Drawing the line at those transactions that will result in the production of an "exportable

good," furthermore, was also "a reasonable policy choice for the agency to make."  Nat'l Cable,

545 U.S. at 986 (quoting Chevron, 467 U.S. at 845) (internal quotation marks omitted).  Indeed,

both of the "adverse effects" provisions support the Bank's decision to focus its "adverse effects"

analyses on transactions relating to "exportable goods."  In the same sentence that it requires the

Bank to "take into account" the adverse effects of its guarantees on domestic industry and

employment, § 635(b)(1)(B) instructs the Bank to "give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports."  12 U.S.C. § 635(b)(1)(B).  While that portion of the statute does not explicitly use the word "goods," "exports" similarly connotes physical objects, not services. Section 635a-2, furthermore, does expressly refer to "goods."  It states that the Bank is to consider whether its guarantees "[are] likely to have an adverse effect on industries . . . and employment in the United States, either by reducing demand for goods produced in the United States or by increasing imports to the United States."  Id. § 635a-2 (emphasis added).  Both § 635(b)(1)(B) and § 635a-2, then, provide textual hooks for the Bank's focus on "exportable goods."

Other portions of the Bank Act also support the Bank's decision to focus its consideration of "adverse effects" on transactions that have the potential to result in the production of exportable goods.  Section 635(e)(1), which will be discussed in more detail in Part III.C.2, *infra*, for example, prohibits the Bank from extending a "financial guarantee for establishing or expanding production of any commodity for export by any country other than the United States, if," among other things, "the Bank determines that the extension of such credit or guarantee will cause substantial injury to United States producers of the same, similar, or competing commodity."  12 U.S.C. § 635(e)(1) (emphasis added).  While § 635(e)(1) is distinct from the two "adverse effects" provisions, it is similarly concerned with the impact of Bank transactions on domestic industry.  Given both the explicit limitation of that provision to transactions that will result in the production of a "commodity for export" and the language in §§ 635(b)(1)(B) and 635a-2 that implies a similar emphasis, the Bank Act as a whole can be reasonably read to focus

its concern for domestic industry and employment on those transactions that involve "exportable goods."

Since the application of the Bank's EIPs constitutes consideration of "adverse impacts" and the Bank Act supports – or, at the very least, is not inconsistent with – the Bank's focus on transactions that result in "exportable goods," the Court concludes that the Bank's institution and application of its EIPs satisfies the agency's obligations under §§ 635(b)(1)(B) and 635a-2.

In reaching such a conclusion, the Court is not untroubled by the possibility of a foreign-airline transaction of such a kind and on such a scale that it would have massive adverse effects on domestic industry and nonetheless fail to qualify for additional economic-impact scrutiny. Although Plaintiffs do not press this possibility, its specter has not gone unnoticed. This case, however, does not embody such a situation. And, in any event, were the Bank to contemplate such a transaction, it might well determine to go forward with an in-depth economic-impact analysis. But regardless, there remain significant external checks on such hypothetical transactions: Congress not only has a recurring opportunity to decline to reauthorize the Bank, but it also gets the chance to review new commitments of more than $100 million before they take effect. 12 U.S.C. § 635(b)(3). Such review means this scenario could only come to pass with congressional assent.

Also not passing the Court's notice is the fact that the effect of the EIPs is to exclude the vast majority of Bank transactions from in-depth economic-impact analysis. See ATA's Reply in Support of Prelim. Inj. (ECF No. 27), Exh. B (2007 GAO Report) at 12 (only .2% of Bank transactions were subjected to in-depth "adverse effects" consideration during fiscal years 2003-2005). The Bank Act, however, leaves it to the Bank – not the courts – to determine both how the "adverse effects" of a transaction on domestic industry and employment ought to be

identified and when a more detailed inquiry is merited. If Congress wishes to make detailed economic-impact analyses mandatory for a greater percentage of – or for certain categories of – transactions, it may certainly do so. As the statute stands, however, the Bank's obligation is only to insure that "adverse effects" are considered. Because it finds that the Bank's EIPs satisfy that obligation, the Court may go no further.

### iii. *Application of "Exportable Good" Screen Here*

Although Plaintiffs' primary focus is on the validity of the EIPs themselves, they argue in the alternative that the Bank's application of the EIPs to foreign-airline transactions generally – and the Air India Commitments specifically – was arbitrary and capricious. They assert that "[a]ircraft transactions do lead to the production of 'exportable goods' and 'commodities' from foreign countries – namely, available seat miles and available daily seats." ATA & Delta's Opp. & Reply at 40 (emphasis in original). Especially given that the agency has not explained the justification for its contrary determination, Plaintiffs maintain that interpreting "exportable goods" to exclude available daily seats is inconsistent with the APA. That argument, however, fails to overcome the plain meaning of "exportable good" and the considerable deference owed to an agency's interpretation of its own rules.

Neither the Bank Act nor the EIPs define "good," "commodity," or "export." The ordinary meaning of those terms encompasses physical objects, such as airplanes, see Black's Law Dictionary (9th ed. 2009) (defining "goods" as "[t]angible or movable personal property other than money; esp., articles of trade or items of merchandise"), but does not reach to what are ordinarily classified as "services," such as air travel. Id. (defining "service" as "[a]n intangible commodity in the form of human effort, such as labor, skill, or advice"). While Plaintiffs' suggestion that available daily seats on particular flights could be cognizable as "exportable

goods" is perhaps plausible, the contrary interpretation – that the service airlines provide is not an "exportable good" – is just as reasonable, if not more so.  Given the latitude ordinarily afforded to agencies' interpretations of ambiguous terms in their own rules, see Auer v. Robbins, 519 U.S. 452, 462 (1997), the Bank's interpretation of "exportable goods" to exclude such things as available daily seats offered on particular flights is certainly reasonable.

Plaintiffs next suggest that the Bank's failure to provide an explanation of why "exportable goods" does not include available daily seats undermines any deference their interpretation might otherwise be due.  Such an argument is misdirected.  Even if Plaintiffs were correct that the Bank had failed to articulate this position prior to the instant litigation – an allegation that runs counter to their own Complaints, see ATA & Delta's Am. Compl., ¶ 65; ALPA's Compl., ¶ 62 – courts have deferred to agencies' interpretations of their own rules even when such interpretation is offered only "in the course of litigation."  See Drake v. FAA, 392 F.3d 59, 68 (D.C. Cir. 2002) (quoting Auer, 519 U.S. at 461).  Where a term is ambiguous, the agency's reading is "fairly supported by" the rule's text, id., and there is "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question," Auer, 519 U.S. at 462, an agency's interpretation is entitled to deference regardless of whether that interpretation was proffered prior to litigation.  Drake, 392 F.3d at 68.  The Bank's interpretation of "exportable good" to exclude available daily seats hits all three marks.  Given that Plaintiffs' own Complaints acknowledge that "the Ex-Im Bank does not consider applications filed by foreign air carriers . . . to involve exports that 'will result in the production of an exportable good,"  ATA & Delta's First Am. Compl., ¶ 65 (quoting EIPs at 1); ALPA's Compl., ¶ 62 (same), moreover, it is clear that they had "adequate notice" of the Bank's interpretation.  Drake, 291 F.3d at 68.

2.  *§ 635(e)(1)*

While the two "adverse effects" provisions, 12 U.S.C. §§ 635(b)(1)(B) and 635a-2, are

the focal point of Plaintiffs' suit, they are not the only portions of the Bank Act on which

Plaintiffs base their claims.  Whereas §§ 635(b)(1)(B) and 635a-2 merely require the Bank to

consider the impacts of its guarantees on domestic industry (and do not indicate how such

impacts are to be weighed against other considerations), § 635(e)(1) actually forbids the Bank to

approve certain transactions in the interests of domestic industry.  That section provides:

> The Bank may not extend any direct credit or financial guarantee
> for establishing or expanding production of any commodity for
> export by any country other than the United States, if (A) the Bank
> determines that the commodity is likely to be in surplus on world
> markets at the time the resulting commodity will first be sold; or
> the resulting production capacity is expected to compete with
> United States production of the same, similar, or competing
> commodity; and (B) the Bank determines that the extension of
> such credit or guarantee will cause substantial injury to United
> States producers of the same, similar, or competing commodity.

12 U.S.C. § 635(e)(1).  In addition to setting out this two-part inquiry, the statute also defines

"substantial injury":

> [T]he extension of any credit or guarantee by the Bank will cause
> substantial injury if the amount of the capacity for production
> established, or the amount of the increase in such capacity
> expanded, by such credit or guarantee equals or exceeds 1 percent
> of United States production.

Id. § 635(e)(4).

Although Plaintiffs seem to rely less on § 635(e)(1) in their Opposition and Reply, see

ATA & Delta's Opp. & Reply at 35-36 (devoting just a few sentences to § 635(e)(1)), their

Motion and Complaint featured the argument that the Bank violated § 635(e)(1) when it

approved the 2011 Commitments.  See ATA & Delta's Mot. at 15-16; ATA & Delta's Am.

Compl., ¶¶ 77-101; ALPA's Compl., ¶¶ 73-97.  By its own terms, however, § 635(e)(1) only

operates to prohibit a guarantee where each of three circumstances obtain: 1) the guarantee in question is "for establishing or expanding production of any commodity for export," 2) the Bank determines either that "the commodity is likely to be in surplus on world markets at the time the resulting commodity will first be sold" or that "the resulting production capacity is expected to compete with United States production of the same, similar, or competing commodity," and 3) the Bank determines that the guarantee "will cause substantial injury to United States producers of the same, similar or competing commodity."  Id. § 635(e)(1).  Plaintiffs maintain that the Air India Commitments checked each of these three boxes and, therefore, that the guarantees were statutorily impermissible.  See ATA & Delta's Mot. at 15-16.  In failing even to consider the applicability of § 635(e)(1), they argue, the Bank acted arbitrarily and capriciously.  See id.

Plaintiffs' § 635(e)(1) claim falters, however, on its first step.  The Bank's EIPs, as Plaintiffs well know and as was discussed in detail in Part III.C.1, supra, specifically seek to identify for further analysis only those transactions that "will result in the production of an exportable good."  See ATA & Delta's Am. Compl., ¶¶ 64-66 (quoting EIPs at 1-2); ALPA's Compl., ¶¶ 61-63 (same).  When a transaction is screened out at the "exportable goods" step, the agency has effectively determined that § 635(e)(1)'s limitation is not applicable.  Plaintiff identifies and the Court can conceive of no reason why the Bank's equation of "commodities" with "goods" is not a reasonable interpretation of the statute.  See, e.g., The American Heritage Dictionary, 3d ed. (defining "goods" as, inter alia, "commodities").

In applying its EIPs and screening out the Air India transactions at the "exportable good" stage, accordingly, the Bank determined that  § 635(e)(1) did not bar the Air India guarantees.  For the same reasons that the Bank's determination that foreign-airline transactions do not result in the production of "exportable goods" was a reasonable one, see Part III.C.1.iii, so too was its

determination that such transactions do not result in the production of "any commodity for export."  Because the Bank reasonably concluded through the application of its EIPs that the 2011 Commitments would not permit Air India to produce "any commodity for export," the Bank's decision to approve those Commitments did not run afoul of § 635(e)(1).

   3.   *§ 635(e)(7)*

Finally, Plaintiffs claim that the Bank's approval of the 2011 Commitments violated 12 U.S.C. § 635(e)(7), which provides in relevant part: "If, in making a determination under this subsection with respect to a loan or guarantee, the Bank intends to conduct a detailed economic impact analysis or similar study, the Bank shall" comply with certain enumerated notice-and-comment procedures.  12 U.S.C. § 635(e)(7)(B).  Although the statute states that those notice-and-comment procedures are only required "if" the Bank "conduct[s] a detailed economic impact analysis" and although Plaintiffs admit that no such analysis was conducted with respect to the Air India transactions, Plaintiffs nevertheless argue that the Bank violated this portion of the Bank Act by failing to follow the notice-and-comment requirements outlined therein.  See ATA & Delta's Mot. at 16-19.  In addition, although Plaintiffs' § 635(e)(7) claim is couched in procedural terms, Plaintiffs also attempt to use § 635(e)(7) to impose a substantive obligation on the Bank.  Fairly construed, their position appears to be not just that the Bank was required to abide by the § 635(e)(7) notice-and-comment procedures, but also that § 635(e)(7) requires the Bank to perform a detailed economic-impact analysis for each transaction it approves.  The Bank cannot "escape . . . its obligation to provide notice-and-comment under § 635(e)(7)" for the vast majority of its transactions, Plaintiffs contend, "simply by deciding" not to undertake a detailed economic impact analysis.  See id. at 18.

The statute, however, gives the Bank the authority to do just that.  By conditioning the notice-and-comment requirements on the Bank's decision to conduct a "detailed economic impact analysis," § 635(e)(7) clearly contemplates that the Bank will not perform such an analysis for every transaction it considers.  Plaintiffs, moreover, point to no other language in the statute suggesting that this conditional language was intended to mandate detailed analyses in every case.  Congress could have said, "The Bank shall conduct a detailed economic impact analysis before approving any loan or guarantee, and such analysis shall be subject to the following notice-and-comment requirements."  It did not do so.  Instead, it provided that such steps would be required only "[i]f . . . the Bank intends to conduct a detailed economic impact analysis."  12 U.S.C. § 635(e)(7)(B) (emphasis added).  There is a world of difference between this language and the obligation Plaintiffs seek to impose.

In attempting to evade the statute's plain import, Plaintiffs rely almost entirely on Ramah Navajo Sch. Bd. v. Babbitt, 87 F.3d 1338 (D.C. Cir. 1996).  See ATA & Delta's Mot. at 17-18; ATA & Delta's Opp. & Reply at 36 & n.33.  That case, however, is entirely inapposite.  The statute at issue in Ramah required the Bureau of Indian Affairs to comply with strict formulas in allocating federal funds to Indian tribes.  See Ramah, 87 F.3d at 1341-42.  The funding provisions were "drafted . . . in mandatory terms ('There shall be added . . . contract support costs which shall consist of . . . [and] shall include . . .') and forbade the Secretary to reduce the amount of funding for virtually any reason."  Id.  (internal citation omitted) (quoting the Indian Self-Determination Act, 25 U.S.C. § 450j-1(a)(2)-(3)) (emphases and alterations in original).  Given this clear statutory command, the court found that a separate "notwithstanding" clause neither relieved the BIA of its obligations nor committed its allocation decisions to the agency's discretion.  See id.

In relying on <u>Ramah</u>, Plaintiffs suggest that the "if" in § 635(e)(7) – like the "notwithstanding" in <u>Ramah</u> – should not be read to limit the Bank's obligation to perform detailed economic-impact analyses and comply with the corresponding procedural obligations for every transaction it approves.  No such obligation, however, existed in the first place. <u>Ramah</u>, which turned on mandatory language that saddled the agency with a definite obligation, is thus inapplicable.  Nothing in § 635(e)(7) supports Plaintiffs' contention that the Bank is obligated to perform detailed economic-impact analyses for every transaction.  Plaintiffs' attempt to transform the optional language of § 635(e)(7) into a mandatory requirement, therefore, falls flat.

In the final analysis, although Plaintiffs mount significant and probing challenges to the Bank's procedures both generally and in specific relation to these Air India Commitments, the Court does not believe the unprecedented step of invalidating those procedures or their application to the Air India transactions is warranted here.  It is not for the Court to determine the advisability of these Commitments or to enter the lists on behalf of either domestic airplane manufacturers or domestic airlines.  The Court's sole role is to determine whether the Bank has acted arbitrarily, capriciously, or in violation of the law.  In this case, it cannot so find.

## IV.	Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting Defendants' Motion for Summary Judgment and denying Plaintiffs' Motions.


*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  <u>July 18, 2012</u>